[No. 49244-1. En Banc. November 6, 1984.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES
R. CAMPBELL, *Appellant*.

4

*Charles Rodman Campbell,* pro se, and *Mark Mestel* and *Anthony Savage,* for appellant.

*Seth Dawson, Prosecuting Attorney, Larry E. McKeeman, Chief Criminal Deputy,* and *S. Aaron Fine, Deputy,* for respondent.

Dimmick, J.—Defendant Charles Rodman Campbell appeals his conviction of three counts of first degree murder and his death sentence. Twelve issues are presented:

1. Whether the trial court violated defendant's right to a speedy trial (CrR 3.3), by granting defense counsel's request for a trial continuance over defendant's objection.

2. Whether it was error for the prosecutor in his opening statement to refer to defendant's attempted rape of witness Kedziorski which was not proved at trial.

3. Whether the prosecution's failure to disclose to the defense the exculpatory evidence of witness Frase's inability to identify defendant's jacket was corrected by the trial judge's instructions to the jury.

4. Whether the trial court erred in allowing the Chambers to testify at trial when their nonverbatim statements, taken by the police, were destroyed.

5. Whether the trial court denied defendant's right to confrontation when it prohibited cross examination of Jerold Ethington as to his refusal to give hair samples or try on an article of clothing.

6. Whether the trial court abused its discretion in admitting into evidence items seized from defendant at the time he was taken into custody.

7. Whether the search and seizure of defendant's car

and the items contained therein violated the Fourth Amendment and Const. art. 1, § 7.

8. Whether the trial court abused its discretion in admitting into evidence the glass containing defendant's fingerprint.

9. Whether the special sentencing proceeding, RCW 10.95.040, violates equal protection, violates separation of powers, or is unconstitutionally vague because it grants the prosecutor discretion to request the death penalty.

10. Whether the special sentencing proceeding provides insufficient statutory standards to guide the jury and whether an instruction to the jury as to the eight mitigating factors contained in the statute constituted additional aggravating circumstances or an impermissible judicial comment on the evidence.

11. Whether defendant's death sentence withstands the three statutory appellate review questions mandated under RCW 10.95.130(2).

12. Whether the death penalty is cruel punishment in violation of Const. art. 1, § 14.

We affirm, finding no error in defendant's trial or sentencing.

On April 14, 1982, Renae Wicklund, her 8-year-old daughter Shannah Wicklund, and a neighbor friend, Barbara Hendrickson, were found dead in the Wicklund home in Clearview, Washington, by Hendrickson's husband, Donald. Renae was home sick in bed on April 14, 1982. Normally, she was self-employed as a school financial aid consultant. Barbara had gone over to the Wicklund residence at 4:20 p.m. to take Renae's temperature, blood pressure, and help Shannah make Jello. Donald went over at 6:30 p.m., concerned he had not heard from his wife for over 2 hours. Evidence produced at trial indicated Renae had been the first victim. She was found nude on her bedroom floor. Shannah, the second victim, had been attacked in the dining room, then dragged into her mother's bedroom and killed. Barbara, the third victim, had also been attacked in the dining room and killed in the hallway.

6

All three had been beaten and assaulted prior to death. The right earlobes of Renae and Barbara had been torn, indicating trauma to the perforations where pierced earrings had been in place. The autopsy revealed Renae had received extensive blunt trauma beating on her head, back, and upper chest area. Her jaw and nose were broken and she had been strangled. Her neck had a 7–inch incision across the front, which severed both carotid arteries. She had bled to death from the neck cut. After her death, a blunt object was used to tear a 1–inch cut into the upper end of the vaginal wall. Shannah had also been strangled and had a 7½–inch cut across her upper neck, inflicted by extending her backward and elevating the chin. She had suffered a massive hemorrhage such that a blood sample was difficult to obtain. Barbara had a 7–inch upper neck cut and also had died by a massive hemorrhage.

Campbell had prior contacts with the victims. In 1974, he assaulted and sodomized Renae in the same residence in which she was killed in 1982. Her daughter Shannah was restrained by the defendant who held a knife to her throat and threatened to harm her if Renae did not submit. Afterward, Renae ran to her neighbor's home (Barbara Hendrickson's) for help. In 1976, Campbell was convicted of the 1974 first degree assault and crime of sodomy on Renae. Both Renae and Barbara had testified at trial against Campbell. At the time of the murders, defendant was an inmate at Everett Work Release Facility.

A few days after the homicides, Campbell was charged by information with three counts of aggravated first degree murder. He was appointed counsel, and at arraignment the trial judge entered a not guilty plea. In May 1982, the State filed notice for a special sentencing proceeding to determine whether the death penalty should be imposed. Trial was set for June 29, 1982.

On June 21, 1982, defense counsel, over Campbell's objection, made a motion for continuance, based upon the vast amount of discovery to be completed and to afford defendant a fair trial with effective assistance of counsel.

The State opposed this motion. However, the trial court granted the continuance until September 7, 1982, believing the "administration of justice and the interests of the defendant will best be served." On August 5, 1982, counsel was permitted to withdraw because of conflict with defendant over the continuance. New counsel was appointed. On September 27, 1982, Judge Kershner denied defendant's motion to dismiss, concluding CrR 3.3 created a procedural, not a fundamental right, which may be waived over defendant's objection. Subsequently, trial was again continued with defendant's acceptance. Jury selection began on October 25, 1982, in Spokane. The site was selected by Judge Britt, pursuant to a defense motion for change of venue. After the jury was impaneled, trial began in Everett on November 8, 1982.

The State's case was overwhelmingly strong, relying upon numerous witnesses and abundant evidence linking Campbell to the crimes. Campbell's girl friend, Judith Dirks, testified Campbell visited her on the morning of April 14, 1982. He had been drinking and drank a six-pack of beer at her home. On April 15, Dirks testified she noticed her butcher knife, with 6-inch blade, was missing. Dirks also stated Campbell felt a resentment toward Renae and had driven by her home while on work release.

At about 1 p.m. on April 14, 1982, Campbell visited a friend, Debbie Kedziorski, at her home. At a pretrial motion in limine, defense counsel attempted to preclude the State from eliciting facts that Campbell had attempted to rape Kedziorski. The court denied the motion, finding such testimony permissible under ER 404(b). The court stated, "Such testimony, if believed by the jury, could constitute evidence of identity, motive, intent [or] mental state of the defendant." The court, however, cautioned "the prosecutor against over-developing [Kedziorski's] anticipated testimony in opening statement." During the opening statement the prosecutor initially admonished the jury not to consider anything he said in the opening statement to be evidence. Rather, his purpose was to "simply outline the

case." Subsequently, the prosecutor stated Campbell "attacked" Kedziorski, "attempted to rape her, forced her to the floor, [and] tried to take her clothes off."

At trial Kedziorski testified Campbell had made two passes at her and then asked if she "wanted to get it on." She rejected all his advances and testified Campbell "never hurt me or anything", although she was upset and crying. She had asked Campbell if he wanted a back rub to "feel better." Once on the floor, he "tugged at her clothes," but "backed off" when told to by Kedziorski. Following this testimony, defense counsel's motion for mistrial was denied.

Tim Fowler, a neighbor boy, testified that while riding home from school on the bus at 3 p.m. on April 14, 1982, he saw a red car parked in an inlet in the woods, with a man 6 feet 1 inch to 6 feet 2 inches, with sandy–brown wavy hair, nearby. Tim's brother, Mike Fowler, testified he saw the car parked in the woods around 3:15 to 3:20 p.m. Tim's dad, Jim Fowler, testified that at 3:40 that afternoon he saw the same car backed into the woods. The type of car described by the witnesses was very similar to the one owned by Campbell.

Eleven–year–old Josette Frase, next door neighbor of the Wicklunds, testified at trial that at about 3:30 p.m. on April 14, 1982, she saw a man wiggle around in the bushes by her house and then walk down a gravel road. She testified he was tall, had dark brown curly hair, and was wearing a blue sports jacket with a yellow stripe running across the middle. She identified Campbell in court and at a lineup, as the man she saw. A blue jacket was taken from Campbell's room the next day, pursuant to a search warrant.

During trial, the prosecution admitted that Frase had been asked in October 1982 to view the blue jacket seized from Campbell's room, but she was unable to identify it. The State admitted it was an "oversight" not to disclose this exculpatory evidence to the defense. Defense counsel moved for a mistrial. This motion was denied, but Judge Britt ordered that Frase be recalled to testify that she could not identify the jacket.

When recalled by the defense, Frase testified she was unable to identify the jacket. On cross examination, the prosecution attempted to establish that the jacket taken from Campbell's room might have been the same jacket. The defense renewed the motion for mistrial. This was denied by the trial judge who instructed the jury to disregard the cross examination by the prosecutor. The judge further informed the jury that "[i]t has been stipulated by the State that Exhibit 151 is not the jacket worn by the man Josette Frase saw on April 14, 1982."

On April 15, 1982, Lester Chambers, neighbor of the Wicklunds, phoned the Snohomish County Sheriff's Department. He reported that at 5 p.m. the day before he and his wife had seen a tall guy, with brown "afghan" hair, dark chin beard, and carrying a bedroll walk like he was intoxicated down the road and then disappear up into the bushes. Around 5 p.m., neighbor boys also testified they saw a tall man walk down Waverly Drive carrying a bundle over his shoulder. Mr. Chambers used high powered binoculars to observe this man. Both Mr. and Mrs. Chambers at trial testified Campbell resembled the person they saw.

Mr. Chambers initially spoke to Detective Belinc who noted Chambers described the suspect as a white male, in his forties with a full beard. Belinc had an officer dispatched to personally talk with the Chambers. Deputy Angell talked with the Chambers on April 15, 1982, and took notes of the interview, which he delivered to Deputy Pszonka at the crime scene. At trial Deputy Pszonka denied receiving the notes. The original notes were never found. On October 22, 1982, Angell wrote out a second report setting out his best recollection of the conversation with Mr. Chambers. That report described the stranger as "a transient appearing person." However, during direct examination Angell testified Mr. Chambers described the individual as 6 feet or taller, with curly hair, and transient looking. The defense moved for a mistrial. This motion was denied. However, the court instructed the jury to disregard all of Angell's testimony regarding the description of the individ-

ual given him by the Chambers except that the individual was transient looking. Later the judge instructed the jury:

> The State has not produced the notes taken by Deputy Angell during his April 15th, 1982 interview of Mr. and Mrs. Chambers. If, as a matter of reasonable probability, it appears naturally in the interest of the State to produce those notes and if the State fails to satisfactorily explain why it has not produced such notes, you may infer that the notes would have been unfavorable to the State, if you believe such inference is warranted under all the circumstances of the case.

Jerold Ethington was a fellow resident with Campbell at Everett Work Release. At about 6 p.m. on April 14, 1982, Campbell and Ethington left the facility in Campbell's car. Campbell was carrying a bundle of clothes. After buying and sharing a quart of beer, they went to the Lowell Boat Launch on the Snohomish River. There, Campbell asked Ethington to walk back to the paved road. Ten to fifteen minutes later they left the area. Ethington later reported this incident to Snohomish County Detective Bart. The two went to the area on April 16, where Bart recovered a bracelet and an earring. Diving units later retrieved evidence from that area: a piece of pottery, two earrings, two necklaces, and a brass holder. These items were linked to the Wicklund home and the victims. In addition, a pair of jeans and a shirt were recovered from the river.

Ethington's involvement became an issue in defendant's case when, in October 1982, defense counsel requested production of a hair sample from Ethington, to compare with hair found on the victims. This order was initially granted. Subsequently, the defense moved to require Ethington to try on the jeans and shirt retrieved from the river. Judge Britt later, at the request of Ethington's appointed attorney, vacated the order authorizing hair samples and denied the request to order Ethington to try on the retrieved clothes. He believed he had neither statutory nor constitutional power to rule otherwise and the facts implicating Ethington did not rise to probable cause.

At trial, the defense sought to cross–examine Ethington

and ask whether he was willing to give a hair sample or try on the clothes. The court denied this request because the asking of such a question with full knowledge of the answer would confuse the real issues of the case, mislead the jury, and place in their minds an inappropriate suspicion. However, in final argument, the judge did not limit the defense's reference to the hair samples and the possibility that the clothes fit Ethington.

At about 8 p.m. on April 14, 1982, the day of the murders, Correctional Officer Margaret Ashby was informed by a resident at Everett Work Release that Campbell was drunk. Being unable to awaken Campbell, Ashby called Correctional Officer Gary Whitinger for assistance. Around 10 o'clock that evening, Whitinger attempted to get a urine sample from Campbell to test for alcohol or drugs. Campbell refused and became extremely disruptive. Whitinger decided then to take Campbell into custody and suspend his work release status. Everett police officers were called for assistance. Although the State attempted to locate these officers, they were never identified. Prior to the transport to Monroe, one officer patted down Campbell for weapons in Whitinger's presence. Items were retrieved from Campbell and handed directly to Whitinger. These items included the following: receipt for tires, pair of earrings, dollar bill, guitar pick, cigarettes, and mace container. The earrings were later identified by witness Lou Pardo, a close friend of the Wicklunds, as belonging to Renae Wicklund.

Whitinger testified that the items seized from Campbell were given to Ashby who was instructed to put them in an envelope, mark the envelope, and place it on Supervisor Tom Cornish's desk. Ashby did not recall ever receiving these items. The next morning Cornish found a white envelope on his desk containing the items. He then sealed and locked these items into his desk drawer, later turning them over to Snohomish County Police. Cornish testified that the correctional officer on duty had access to his desk during the night, but the residents did not have access.

On the morning of April 15, 1982, Supervisor Tom

Cornish of Everett Work Release was informed by another correctional officer that Jerold Ethington's raincoat had been left in Campbell's car parked on the street. Cornish went to the car to retrieve the raincoat and look for evidence of alcohol consumption, for which Campbell had been suspended. He found and removed the raincoat and a beer bottle and cans. He also noticed an earring, which he left behind.

At about 11:30 a.m., Sergeant Joseph Belinc came to Everett Work Release looking for Campbell. Cornish pointed out Campbell's car to Belinc. Belinc peered into Campbell's car from the street and observed an earring inside. An affidavit was then prepared by Belinc from which a search warrant was issued.

At about 1 p.m., Snohomish County Police served a search warrant for evidence to be found in Campbell's car and room, and for items previously seized from him by Cornish. Cornish gave the officers the beer cans and bottle and the items seized from Campbell the night before. The car was subsequently impounded and the earring removed. At trial, a business associate of Renae Wicklund testified with particularity that the earring recovered from Campbell's car had been given by him to Shannah Wicklund as a birthday present.

Detective Oberg processed the Wicklund home for latent fingerprints on April 14 and 15, 1982. He gathered a glass from the kitchen, dusted it, and noticed fingerprints on the glass that appeared to be in a reddish–purplish substance. He then packaged the glass to prevent contamination. He subsequently took the packaged glass to the Snohomish County Sheriff's Evidence Control Room. Oberg, on April 19, fingerprinted Campbell. On April 22, Oberg formally logged the glass onto the property log. The packaged glass and other evidence was double wrapped, placed in a nailed wooden box, and sent to the Federal Bureau of Investigation. Special Agent Richard Reem received the evidence and located human blood on the glass. The glass was then sent to Special Agent Steven Kasarsky for fingerprint

examination. Kasarsky testified he did not see any visibly latent prints, nor any reddish–purplish impressions, and it appeared the glass had not been previously processed for prints. He then dusted for prints, found one, and testified at trial with "scientific certainty" the print matched Campbell's.

Campbell did not testify at trial but did assist with cross examination. The defense on direct called several of the state witnesses to refute their earlier testimony. Additionally, the defense called its legal investigator, Sylvia Matthews and a forensic scientist, Raymond Davis.

On November 26, 1982, the jury convicted Campbell on all three counts. The jury found four aggravating factors: (1) Defendant was serving a term of imprisonment at the time of the act resulting in death, RCW 10.95.020(2); (2) the victims (Barbara and Renae) were former witnesses in an adjudicated proceeding against the defendant and the murder was related to the exercise of their official duties performed at the proceeding, RCW 10.95.020(6)(b); (3) defendant committed the murder of Barbara and Shannah to protect or conceal his identity, RCW 10.95.020(7); and (4) the murder was committed in the course of, or in furtherance of, or in immediate flight from the crime of burglary in the first degree, RCW 10.95.020(9)(c). A special sentencing proceeding was held whereby the jury was convinced beyond a reasonable doubt that there were not sufficient mitigating circumstances to merit leniency. Judge Britt sentenced Campbell to death. Mandatory review of the death sentence was then brought before this court. RCW 10.95.100.

# I
## SPEEDY TRIAL

Defendant argues that the trial court erred in granting defense counsel's motion for a continuance of trial from June 29 to September 7, 1982, over defendant's objection. He contends CrR 3.3, which requires a defendant not released from jail be brought to trial not later than 60 days

after arraignment, is a fundamental, as opposed to a procedural, right. Moreover, he maintains he has a constitutional right to control his own defense, which cannot be deferred to counsel. Additionally, he believes he was a victim of inadequate representation, in that his previous counsels' request for a continuance was based solely on their inability and unwillingness to effectively and aggressively represent him. Defendant asserts that he was substantially prejudiced by the continuance, because on June 29, the State had much less evidence against him (*e.g.,* FBI reports not completed until August).

The State maintains that a defendant's right to a speedy trial may be waived by counsel, over defendant's objection, if, as here, counsel is acting effectively for defendant's best interest in requesting more time for trial preparation. The State also argues that CrR 3.3(h)(2) allows the *court* to "continue the case when required in the administration of justice and the defendant will not be substantially prejudiced in the presentation of his or her defense", *without* the consent of either the defendant or the prosecutor. If there is a conflict of constitutional rights, the State believes defendant's right to effective counsel outweighs his right to a speedy trial. Otherwise, the State contends defense counsel could obtain dismissal of the charges against a client by neglecting to prepare a case. The State argues the trial court was not required to advise Campbell he had the right to be represented by ineffective counsel or proceed pro se. Lastly, the State contends the trial court properly exercised its discretion in granting a continuance, and defendant was not prejudiced by the determination.

On appeal, a trial court's grant or denial of a motion for continuance will not be disturbed absent a showing of manifest abuse of discretion. *State v. Miles,* 77 Wn.2d 593, 597–98, 464 P.2d 723 (1970).

Here Judge Britt properly exercised his discretion under CrR 3.3(h)(2). *State v. Laureano,* 101 Wn.2d 745, 755, 682 P.2d 889 (1984). Moreover, he made a proper record of reasons for failure to comply with CrR 3.3 time

limits. *State v. Williams*, 87 Wn.2d 916, 920, 557 P.2d 1311 (1976). He found Campbell's counsel could neither effectively represent him nor ensure that he received his constitutional right to a fair trial within 60 days of arraignment, "through no fault of their own but because of the complexity and length of this case." He recognized that if he denied the continuance "the argument might be made upon review that Mr. Campbell was thus denied the effective assistance of counsel." While attorneys for the State moved to go to trial by June 29, they conceded discovery would not be completed by that date. Campbell himself agreed to the final trial continuance. The fact that trial began within 6 months of arraignment, albeit with more evidence, did not prejudice Campbell's defense. Trial within 60 days is not a constitutional mandate. *Accord, State v. White*, 94 Wn.2d 498, 501, 617 P.2d 998 (1980); *Barker v. Wingo*, 407 U.S. 514, 523, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972) ("no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months"). Counsel was properly granted the right to waive trial in 60 days, over defendant's objection, to ensure effective representation and a fair trial.

## II
### ATTEMPTED RAPE OF KEDZIORSKI

Defendant alleges prosecutorial misconduct by the State in referring in its opening statement to Campbell's attempted rape of Debbie Kedziorski, which supposedly occurred several hours before the triple homicides. Defendant maintains the State knew it could not substantiate its version of the events and flagrantly abused the court's admonishment not to overdevelop the testimony. The State contends the statement was made in good faith, based upon an earlier police report, and was "arguably" consistent with Kedziorski's testimony. Alternatively, the State argues if misconduct is found, any error is harmless because of defendant's overwhelming guilt.

A prosecutor's opening statement should be confined

to a brief statement of the issues of the case, an outline of the anticipated material evidence, and reasonable inferences to be drawn therefrom. *State v. Kroll,* 87 Wn.2d 829, 834–35, 558 P.2d 173 (1976); 1 American Bar Ass'n, *Standards for Criminal Justice,* Std. 3–5.5 (2d ed. 1980). Testimony may be anticipated so long as counsel has a good faith belief such testimony will be produced at trial. *State v. Grisby,* 97 Wn.2d 493, 499, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1011 (1983). The trial court has wide discretion in determining the good faith of the prosecutor. *State v. Lyskoski,* 47 Wn.2d 102, 107, 287 P.2d 114 (1955). *See* Annot., 16 A.L.R.4th 810, § 7(a), (b) (1982). The burden of showing bad faith is upon the defendant. *State v. Parker,* 74 Wn.2d 269, 274–75, 444 P.2d 796 (1968), *overruled on other grounds in State v. Gosby,* 85 Wn.2d 758, 767, 539 P.2d 680 (1975).

We find the prosecutor's opening statement in totality to have been brief, and rather mild considering the gruesomeness of the murders. We believe the State possessed a good faith belief Kedziorski had been the subject of an attempted rape. We believe this evidence was especially relevant and probative because rape in the first degree was charged in the State's information. RCW 10.95.020(9)(b). FBI reports indicated the presence of sperm in Renae Wicklund's vagina. However, Judge Britt did not remove this aggravating factor from the jury's consideration until nearly the very end of the trial. He did so because the testimony did not establish beyond a reasonable doubt a rape occurred in close proximity to Renae's death. We view the reference to the attempted rape as an unfortunately worded conclusory statement. However, whether there was an attempted rape was a jury question. The prosecutor was simply outlining his version of the case. Moreover the jury was admonished by the prosecutor and trial judge that counsel's remarks were not evidence. *State v. Grisby, supra* at 497. These admonishments, along with the actual testimony of Kedziorski, diluted the impact of the prosecutor's statement and in fact worked to the State's disadvantage.

We hold the opening statement was made in good faith.

## III
### NONDISCLOSURE OF UNIDENTIFIED JACKET

Defendant asserts the fact Josette Frase could not identify Campbell's jacket as being the one worn by the intruder in the bushes, in a pretrial view, was exculpatory evidence which the prosecution had a constitutional duty to disclose. Failure to disclose this evidence allegedly undermined Campbell's defense and was not cured by the State's stipulation. The State argues sanction for delayed discovery lies within the discretion of the trial court, and any prejudice was cured by the stipulation that Campbell's jacket was not worn by the intruder.

■ A prosecutor has a constitutional duty to disclose exculpatory matter to the defense, when there has been a general request. *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *State v. Vaster*, 99 Wn.2d 44, 49, 659 P.2d 528 (1983).

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

(Footnote omitted.) *Agurs*, at 112–13. In *Agurs*, the prosecutor's failure to disclose the murder victim's criminal record was held not to deprive defendant of a fair trial.

The fact Frase could not identify Campbell's jacket in a pretrial view is exculpatory evidence, especially in light of the fact she was one of the State's principal eyewitnesses. However, this omitted evidence is not substantial enough to have created a reasonable doubt that did not otherwise exist. While the prosecution should have disclosed this fact, failure to do so did not rise to constitutional error. More-

over, the trial judge's statement to the jury cured any error created by the omission. The State stipulated that Campbell's jacket was not worn by the man Frase saw, and the judge read the statement to the jury.

## IV
### MISSING POLICE NOTES

Defendant asserts that his constitutional rights of confrontation and due process of law were violated by the court's allowing the Chambers to testify at trial, when notes of their original statements taken by Officer Angell were destroyed. Defendant wanted to utilize the notes to cross–examine and impeach the Chambers with prior inconsistent statements. Defendant implies that the notes were not lost in good faith, and that they were of substantial materiality and would probably have affected the outcome of the trial or his death sentence.

The State believes the officer's summary of the Chambers' statements, even if found, would not have been admissible to impeach, because they were nonverbatim witness statements. Moreover, the State contends there is no constitutional duty to provide discovery of nonverbatim statements. The impeachment value of the notes was marginal, according to the State, as the identification testimony was vague and cumulative. The State maintains the loss of the notes was in good faith and understandable, considering the extensive investigation. Additionally, the State argues the overwhelming proof of defendant's identity, along with the "missing evidence" instruction, required a denial of his mistrial motion.

█ In *State v. Vaster, supra,* this court adopted a balancing test to be applied in those cases in which there has been an inadvertent or good faith loss or destruction of evidence. The first consideration is "whether there exists a *reasonable possibility* that the missing evidence would have affected the defendant's ability to present a defense." Burden of establishing "reasonable possibility" rests with the defendant. "Reasonableness" is determined in light of

the particular circumstances of each case. Lost or destroyed evidence that does not rise to the level of establishing a reasonable possibility that it will exculpate a defendant will be deemed insufficiently material to constitute a due process violation. Next, the court must balance the consideration of "reasonableness" against the ability of the prosecution to have preserved the evidence, considering the procedures established for preserving evidence, the nature of the lost evidence, and the circumstances surrounding the loss. *Vaster,* at 52. In *Vaster,* the inadvertent destruction of a rape victim's vaginal fluid sample was held not to violate defendant's due process right to a fair trial when there was unusually detailed eyewitness identification and there was a low percentage of probability that the fluid sample could be exculpatory. *Vaster,* at 53. *See State v. Gilcrist,* 91 Wn.2d 603, 590 P.2d 809 (1979) (lost hair sample did not violate due process); *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978) (destruction of used Breathalyzer ampuls did not violate due process); *State v. Wright,* 87 Wn.2d 783, 557 P.2d 1 (1976) (destruction of all direct evidence against defendant, found at murder scene, constituted a due process violation requiring dismissal of charges).

While the State is incorrect in its contention that non-verbatim witness statements are inadmissible to impeach (*any* form of inconsistent statement is admissible for the limited purpose of impeaching the witness, E. Cleary, *McCormick on Evidence* § 34, at 67 n.7 (2d ed. 1972)), their value at trial was marginal and did not affect the outcome. The explicit limitation of Officer Angell's testimony and the "missing evidence" instruction significantly aided Campbell's defense. By not sustaining his burden of proving a reasonable possibility that the missing police notes affected his defense, no constitutional error is found.

## V
### CROSS EXAMINATION OF ETHINGTON

Defendant argues he was unconstitutionally denied the right to confront witness Ethington about his failure to give

hair samples and try on the clothing found in the Snohomish River. Defendant implies Ethington was also involved with the homicides. The State maintains Ethington was only tangentially connected with the crime through his knowledge of the evidence retrieved from the Snohomish River. While Ethington was vigorously cross–examined concerning his whereabouts on April 14, 1982, the State maintains any cross examination pertaining to hair samples/clothing demonstration would have no probative value and the trial court properly exercised its discretion in excluding it.

The scope of cross examination lies in the discretion of the trial court and will not be disturbed unless there is a manifest abuse of discretion. *State v. Descoteaux,* 94 Wn.2d 31, 39, 614 P.2d 179 (1980). Here, defense counsel was hoping to cross–examine Ethington and impute liability because he would not cooperate by giving hair samples and a clothing demonstration. Ethington, through counsel, believed this to be an unreasonable search and seizure and intrusion into his privacy. The record does not implicate Ethington in commission of the homicides, nor does it impute a motive to him. An inquiry into the reasons why Ethington did not volunteer a hair sample or clothing demonstration would have raised unwarranted speculation. Judge Britt's denial of that area of cross examination was proper.

## VI
### Items Seized From Campbell

Campbell, pro se, argues the trial court abused its discretion in admitting into evidence the items seized from his person on the night he was taken into custody and suspended from work release. He maintains that the chain of custody was not sufficiently established. Campbell also takes exception to the fact the officers who removed the items were never identified and hence not available for cross examination.

The State asserts that the court properly admitted the

items into evidence and any uncertainty affects the weight of the evidence, not its admissibility. Moreover, the State maintains the evidence was sufficiently established without the searching officers' testimony.

█ Before a physical object connected with the commission of a crime may properly be admitted into evidence, it must be satisfactorily identified and shown to be in substantially the same condition as when the crime was committed. *Brown v. General Motors Corp.*, 67 Wn.2d 278, 285, 407 P.2d 461 (1965); *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960). Factors to be considered "include the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it." *Gallego,* at 917. The proponent need not identify the evidence with absolute certainty and eliminate every possibility of alteration or substitution. *See* cases cited in 5 K. Tegland, Wash. Prac. § 90 (2d ed. 1982). Identity and condition of an exhibit are always subject to rebuttal. *State v. Music,* 79 Wn.2d 699, 713, 489 P.2d 159 (1971), *vacated as to the death penalty,* 408 U.S. 940 (1972). The jury is free to disregard evidence upon its finding that the article was not properly identified or there has been a change in its character. *Gallego,* at 917. However, minor discrepancies or uncertainty on the part of the witness will affect only the weight of evidence, not its admissibility. K. Tegland, § 90, at 203. The trial court is necessarily vested with a wide latitude of discretion in determining admissibility, which will not be disturbed absent clear abuse. *Kiessling v. Northwest Greyhound Lines, Inc.,* 38 Wn.2d 289, 295, 229 P.2d 335 (1951).

The record indicates that the officers handling the evidence adequately preserved it and the chance of tampering is unlikely. The uncertainty of witness Ashby and the fact the police officers in question were never located affects the weight and not the admissibility of the items. Moreover, as Whitinger was present, witnessed the patdown of Campbell, and immediately retrieved the items, any testimony of the officers would have been cumulative. *State v. Dickamore,*

22 Wn. App. 851, 857, 592 P.2d 681 (1979). Hence the evidence was properly admitted.

Campbell's objection that he was foreclosed from cross–examining the officers is without merit as they were never called as witnesses. Additionally, he never exercised his right to compel their attendance nor in good faith attempted to locate them. *See State v. Edwards,* 68 Wn.2d 246, 412 P.2d 747 (1966).

## VII
### SEARCH/SEIZURE OF CAMPBELL'S CAR

Campbell, pro se, asserts the warrantless search of his car by Everett Work Release Supervisor Tom Cornish was in violation of the Fourth Amendment and Const. art. 1, § 7. He contends work release had no control over his car, parked on a public street, and he had an expectation of privacy therein. Moreover, Campbell argues Cornish was acting as an agent of the State when he illegally searched Campbell's car, thereby tainting the second search pursuant to a warrant obtained by Sergeant Belinc. Hence, he argues that all evidence was illegally seized and should have been suppressed. The State counters that Cornish had the power to search Campbell's car, given probable cause to believe a fellow inmate's property and evidence of alcohol consumption would be in the car. Alternatively, the State argues if the first search was illegal Sergeant Belinc's actions were legal under the open view doctrine and validated the warrant.

Washington recognizes a warrantless search exception, when reasonable, to search a parolee or probationer and his home or effects. *Hocker v. Woody,* 95 Wn.2d 822, 826, 631 P.2d 372 (1981) (diminished expectation of privacy); *State v. Coahran,* 27 Wn. App. 664, 666–67, 620 P.2d 116 (1980) (search upon less than probable cause, given well founded suspicion). Such a "diminution of Fourth Amendment protection can only be justified 'to the extent actually necessitated by the legitimate demands of the operation of the parole process.'" *State v. Simms,* 10 Wn. App. 75, 86,

516 P.2d 1088 (1973). An inmate in a work release program is subject to similar if not more restrictive conditions. WAC 275–92. The warrantless search by Work Release Supervisor Cornish was reasonable to obtain Ethington's raincoat and, based upon probable cause, to search for evidence of alcohol. WAC 275–92–355(6). An inmate's expectation of privacy is necessarily lowered while in custody.

■ The observation through Campbell's car window by Sergeant Belinc squarely falls under the open view doctrine. *State v. Seagull*, 95 Wn.2d 898, 632 P.2d 44 (1981).

> [W]hen a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a "search" within the meaning of the Fourth Amendment.

*Seagull*, at 901 (citing 1 W. LaFave, *Search and Seizure* § 2.2, at 240 (1978)). Here, Belinc peered into Campbell's car from the public street and saw jewelry, similar to that observed at the homicide scene. He also observed what appeared to be blood on the driver's side door handle. Such detection was therefore not an illegal search.

## VIII
### Admissibility of Fingerprinted Glass

Defendant objects to the trial court having allowed FBI Agent Kasarsky to testify that the print on a Wicklund kitchen glass, found at the murder scene, matched those of defendant when the chain of custody was not properly established. Defendant specifically questions the fact that Kasarsky, when first receiving the glass, detected no visible fingerprint powder, latent print, or reddish–purplish substance. The State argues that there was a complete showing of the chain of custody; there was no opportunity for any significant change in the condition of the glass; and the possibility of a fingerprint forgery affects the weight of evidence, not its admissibility.

The applicable law addressing admissibility of evidence connected with the commission of a crime was discussed

*supra* in part 6. We find no clear abuse of discretion by the trial court. Preservation and custody of the glass were adequate, despite a 7–day delay in officially logging an entry into the book. The slight variations in the witnesses' testimony regarding the appearance of the glass did not affect its admissibility when proof of Campbell's print was found on the glass with scientific certainty.

## IX
### PROSECUTORIAL DISCRETION

If a person is charged with aggravated first degree murder under RCW 10.95.020,

> [T]he prosecuting attorney shall file written notice of a special sentencing proceeding to determine whether or not the death penalty should be imposed when there is reason to believe that there are not sufficient mitigating circumstances to merit leniency.

RCW 10.95.040(1). Defendant argues this statute is unconstitutional on three grounds. First, he argues an equal protection violation because the statute allegedly vests the prosecutor with unfettered discretion to choose different punishments for similar acts. Second, defendant alleges the statute usurps the judicial sentencing function and is an unlawful delegation of legislative authority in violation of the separation of powers doctrine. Third, Campbell contends the statute is void for vagueness under the due process clause because it invites arbitrary ad hoc prosecutorial discretion to request the death penalty. *See* Lobsenz, *Unbridled Prosecutorial Discretion and Standardless Death Penalty Policies: The Unconstitutionality of the Washington Capital Punishment Statutory Scheme,* 7 U. Puget Sound L. Rev. 299 (1984).

The State maintains there is no equal protection violation because imposition of death requires proof of an additional element (insufficient mitigating circumstances to merit leniency) that need not be proved if the crime is to be punished by life imprisonment. Similarly, the State maintains there is no separation of powers violation in that the

prosecutor is empowered to seek the death penalty when the legislative criteria, as here, are met. Finally, the State contends the statutory standards are sufficiently clear to guard against arbitrary enforcement.

In *State v. Rupe,* 101 Wn.2d 664, 699, 683 P.2d 571 (1984) and *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984), we held the discretion given a prosecutor to seek the death penalty was constitutional. We reaffirm this position, finding no merit in defendant's arguments.

We dispose of defendant's three arguments under the following analysis: First, equal protection of the laws is denied when a prosecutor is permitted to seek varying degrees of punishment when proving identical criminal elements. *State v. Zornes,* 78 Wn.2d 9, 21, 475 P.2d 109 (1970). However, "no constitutional defect exists when the crimes which the prosecutor has discretion to charge have different elements." *State v. Wanrow,* 91 Wn.2d 301, 312, 588 P.2d 1320 (1978). Before the prosecutor may seek the death penalty, he must have "reason to believe that there are not sufficient mitigating circumstances to merit leniency." RCW 10.95.040(1). Similarly, the jury must be "convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency". RCW 10.95.060(4). Absent a unanimous finding, life imprisonment is imposed. RCW 10.95.080(2). There is no equal protection violation here, because a sentence of death requires consideration of an additional factor beyond that for a sentence for life imprisonment—namely, an absence of mitigating circumstances.[1]

Second, "[t]he separation of powers principle requires that the delegation of legislative power to the executive be

---

[1]The Washington statutory scheme provides examples of mitigating circumstances, RCW 10.95.070, discussed *infra,* part 10. But under United States Supreme Court cases, there can be no limitation of mitigating factors presented by defendant. The judge or jury at the sentencing phase must be free to consider any individual circumstances which would argue against imposition of the death penalty. *See Eddings v. Oklahoma,* 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978).

accomplished along with standards which guide and restrain the exercise of the delegated authority." *State ex rel. Schillberg v. Cascade Dist. Court,* 94 Wn.2d 772, 781, 621 P.2d 115 (1980). "The decision to prosecute must be based on the prosecutor's ability to meet the proof required by the statute." *State v. Lee,* 87 Wn.2d 932, 934, 558 P.2d 236 (1976). RCW 10.95.040 properly sets out a legislative standard to guide prosecutors. "[T]he grant of discretion to prosecutors does not result in a standardless death penalty statute." *State v. Rupe,* at 700.

Moreover, the prosecutor's discretion to seek the death penalty does not usurp the judicial function to sentence. *See, e.g.,* RCW 10.95.160–.170; *Honore v. State Bd. of Prison Terms & Paroles,* 77 Wn.2d 697, 700, 466 P.2d 505 (1970). In a sense the prosecutor participates in the sentencing process by choosing to request a special sentencing proceeding. But the prosecutor can neither impose the sentence nor require that it be imposed. *People ex rel. Carey v. Cousins,* 77 Ill. 2d 531, 397 N.E.2d 809 (1979). In *Dictado,* we observed that the prosecutor's discretion in this regard is similar to his discretion in charging a crime: "The prosecutor does not determine the sentence; the prosecutor merely determines whether sufficient evidence exists to take the issue of mitigation to the jury." *Dictado,* at 298. The sentencing jury or the judge determines whether the statutory conditions to impose the death penalty are met. RCW 10.95.050(2), .060(4), .080. Moreover, automatic review by the Supreme Court again insures that sentencing remains a judicial function. RCW 10.95.100, .130.

Third, whether a statute is void for vagueness rests upon two considerations. On the one hand, the statute must provide fair notice of the conduct which is prohibited. "Second, it must contain ascertainable standards for adjudication, so that police, judges, and juries are not free to decide what is prohibited and what is not . . ." *Seattle v. Shepherd,* 93 Wn.2d 861, 865, 613 P.2d 1158 (1980).

We believe the legislative standard provides guidance so that prosecutors may "exercise their discretion in a manner

which reflects their judgment concerning the seriousness of the crime or insufficiency of the evidence." *Rupe*, at 700. Accordingly we uphold the constitutional validity of RCW 10.95.040(1).

## X
### JURY DISCRETION

Defendant maintains the special sentencing proceeding affords the jury no standards upon which to direct their deliberations. Moreover, defendant takes exception to jury instruction 7, which embodies RCW 10.95.070.

In deciding the question posed by RCW 10.95.060(4), the jury, or the court if a jury is waived, may consider any relevant factors, including but not limited to the following:

(1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity;

(2) Whether the murder was committed while the defendant was under the influence of extreme mental disturbance;

(3) Whether the victim consented to the act of murder;

(4) Whether the defendant was an accomplice to a murder committed by another person where the defendant's participation in the murder was relatively minor;

(5) Whether the defendant acted under duress or domination of another person;

(6) Whether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired as a result of mental disease or defect;

(7) Whether the age of the defendant at the time of the crime calls for leniency; and

(8) Whether there is a likelihood that the defendant will pose a danger to others in the future.

RCW 10.95.070. Defendant argues that by delineating eight possible mitigating factors, which the defendant has not raised, the court has in fact introduced prejudicial nonstatutory aggravating factors. Further, defendant argues that jury instruction 7 is in essence a judicial comment on the evidence contrary to Const. art. 4, § 16. The State counters

that the statute provides sufficient guidance to the jury for sentencing.

We recently held that the trial court's reading of the relevant factors provided in RCW 10.95.070 "adequately guided the jury as to the nature and function of mitigating circumstances." *State v. Bartholomew,* 101 Wn.2d 631, 647, 683 P.2d 1079 (1984). *See also Rupe,* at 701, 709–10. As in *Bartholomew,* the trial court's recitation of the eight factors merely served as an illustration to the jury of the information it might consider in determining mitigating circumstances. Instruction 7 advised the jury that it "may consider any relevant factors" and that consideration was "not limited" to the eight enumerated factors. We see nothing in the instruction that imposed additional aggravating factors, or that represented an unconstitutional evidentiary comment by the judge. Here, the nonstatutory aggravating factors were limited to defendant's criminal record. Defendant had full opportunity to present any mitigating factors to the jury, following *Eddings v. Oklahoma,* 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). Defendant presented none. The statutory standard for mitigation gives proper guidance to the jury and affords the defendant a basis for a sentence less than death. *See Lockett v. Ohio,* 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (dictating "individualized consideration [is] a constitutional requirement in imposing the death sentence." *Lockett,* at 605).

## XI
### RCW 10.95.130 APPELLATE REVIEW

In reviewing a defendant's death sentence, this court is required to determine:

(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95-.060(4); and

(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant . . . and

(c) Whether the sentence of death was brought about through passion or prejudice.

RCW 10.95.130(2)(a–c).

First, we must determine whether there was sufficient evidence to justify the jury's affirmative determination of the following question:

> "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"

RCW 10.95.060(4). During the guilt phase, Campbell introduced the mitigating factor of his alcohol addiction by personally cross–examining his girl friend, Judith Dirks. Dirks testified she sponsored Campbell, 4 or 5 times a week, on social nights out from the work release program. Dirks testified Campbell drank "almost all the time" and would buy at least a six–pack of beer per night. Campbell's defense offered no mitigating circumstances during the penalty phase. The mitigating factors delineated in RCW 10.95.070 do not appear applicable to Campbell's circumstances. Faced with the overwhelming evidence against Campbell during the guilt phase we too find it difficult to find sufficient mitigating circumstances to merit leniency. Thus we conclude there was sufficient evidence to justify the jury's affirmative finding.

Second, considering the crime and the defendant, we must determine whether capital punishment is excessive or disproportionate to the penalty imposed in similar cases.

> "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120 . . .

RCW 10.95.130(2)(b). Such a proportionality review is not required by the federal constitution in every case in which the death penalty is imposed. *Pulley v. Harris,* ___ U.S. ___,

79 L. Ed. 2d 29, 104 S. Ct. 871 (1984).[2] Rather our proportionality review stems from the state statute. It does presume the death penalty is not per se unconstitutional. *Rupe,* at 697–98; *Pulley,* 79 L. Ed. 2d at 35–36. Hence our inquiry is to determine whether the death "penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Pulley,* 79 L. Ed. 2d at 36.

 While many other defendants have been charged with aggravated first degree murder, we find no other where four aggravating factors in the guilt phase were found to be present by the jury. A case which involves such a multitude of aggravating factors, we are convinced, would, with great frequency prompt a jury to impose the death penalty. Our review of the cases and questionnaires clearly indicates defendant's sentence was proportionate to the crime committed. Moreover, we are hard pressed to find killings more premeditated and revengeful than those committed by defendant. The sentence of death is neither excessive nor disproportionate to the penalty imposed. A more definitive proportionality review will await another day when this court will be confronted with a capital case with far fewer and less severe aggravating factors.

Third, no evidence was presented to support the proposition that defendant's sentence was brought about through passion or prejudice. The selection of a jury from Spokane significantly lessened the local fervor. In sum, we find no grounds to reverse defendant's death sentence under RCW 10.95.130.

---

[2]Historically the United States Supreme Court has examined the "proportionality" of death sentences to determine a violation of the Eighth Amendment's stricture against cruel and unusual punishment. See our discussion in the following section. As reflected in *Pulley,* the present thrust of constitutional review of state death penalty statutes is to assure that "wholly arbitrary, capricious, or freakish sentences" are minimized. *Pulley,* 79 L. Ed. 2d at 37. The Court looks to the sentencing scheme as a whole to determine that "discretion under the statute was sufficiently controlled by clear and objective standards." *Pulley,* 79 L. Ed. 2d at 37, citing *Gregg v. Georgia,* 428 U.S. 153, 197–98, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976).

## XII
### CRUEL PUNISHMENT

█ Finally we are called upon to review the issue raised implicitly by defendant as to whether the death penalty is cruel punishment in violation of Const. art. 1, § 14. We first addressed this issue in *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968), *vacated in part,* 408 U.S. 934 (1972). We held that imposition of the death penalty is not per se unconstitutional, since both the federal and state constitutions recognized capital punishment at the time of their adoption. *Smith,* at 777–78. We further addressed the issue of cruel punishment in *State v. Frampton,* 95 Wn.2d 469, 627 P.2d 922 (1981) (rejecting an argument that hanging was unconstitutionally cruel) and in *State v. Rupe,* 101 Wn.2d 664, 683 P.2d 571 (1984) (rejecting an argument that a choice between hanging and lethal injection was unconstitutionally cruel).

Similarly, the United States Supreme Court has concluded that a state–imposed death penalty per se does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Gregg v. Georgia,* 428 U.S. 153, 168–87, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). The Court has observed that the Eighth Amendment's prohibition against cruel punishment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 89, 101, 2 L. Ed. 2d 630, 78 S. Ct. 590 (1958). The Court has drawn its standard of decency from "an assessment of contemporary values concerning the infliction of a challenged sanction . . .," looking "to objective indicia that reflect the public attitude toward a given sanction." *Gregg,* at 172–73. Additionally, the Court has examined the proportionality of punishment to determine compliance with the Eighth Amendment. *See, e.g., Weems v. United States,* 217 U.S. 349, 54 L. Ed. 793, 30 S. Ct. 544 (1910); *Coker v. Georgia,* 433 U.S. 584, 53 L. Ed. 2d 982, 97 S. Ct. 2861 (1977); *Enmund v. Florida,* 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982). In the latter case, the Court reversed the

death sentence for accessory felony murder on the grounds that it was unconstitutionally disproportionate. The Court found significance in the fact that out of 36 state and federal jurisdictions authorizing the death penalty, only 8 jurisdictions would have imposed the death penalty under the circumstances of *Enmund. Enmund,* at 789. *But see Pulley v. Harris, supra,* holding that the California death penalty statute was not invalid for failing to require a review of proportionality.

In a case involving legislative penalties imposed for recidivism, we asserted this court's role in reviewing such penalties under the state constitutional prohibition against cruel punishment. *State v. Fain,* 94 Wn.2d 387, 617 P.2d 720 (1980). Proportionality of the sentence was central to our analysis of cruel punishment as it affected a life sentence. *Fain,* at 396–97. Proportionality in that context included "the punishment defendant would have received in other jurisdictions . . . and . . . the punishment meted out for other offenses in the same jurisdiction." *Fain,* at 397.

Following our analysis in *Fain,* and the United States Supreme Court's rationale in *Gregg, Weems,* et al, we then look to contemporary standards and proportionality. Experience in other states offers guidance. Our independent evaluation of all state statutes shows 38 states presently authorize the death penalty. See appendix. Except for California, where the death penalty was enacted through the initiative process, the legislatures of the states have enacted the death penalty. These legislative enactments primarily have been modifications of existing death penalty statutes to comply with federal constitutional standards. *Gregg,* at 179 n.23 (at least 35 states between 1972 and 1976 modified their capital punishment statutes to comply with *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972)). Additional modifications were required after the statutory schemes in North Carolina, Louisiana, and Ohio were struck down. *Woodson v. North Carolina,* 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct.

2978 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001 (1976); *Lockett v. Ohio, supra.* We note our current statute, RCW 10.95, is far more protectively drafted than the majority of other state statutes, by its careful limitation of aggravating circumstances.

We are also mindful of the fact the clear majority of other state courts presented with a similar state constitutional challenge have ruled the death penalty is neither cruel nor unusual punishment.[3] Only two state courts have held the death penalty to be cruel or unusual punishment under their state constitutions and those decisions were overturned by initiative or legislative action. *See People v. Anderson,* 6 Cal. 3d 628, 493 P.2d 880, 100 Cal. Rptr. 152 (1972); *District Attorney v. Watson,* 381 Mass. 648, 411 N.E.2d 1274 (1980). In California, the people in November 1972, adopted a constitutional amendment, Cal. Const. art. 1, § 27, which overruled *Anderson. People v. Frierson,* 25 Cal. 3d 142, 184, 599 P.2d 587, 158 Cal. Rptr. 281 (1979). Cal. Const. art. 1, § 27 states in part:

> The death penalty provided for under those statutes shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments within the meaning of Article 1, Section 6 nor shall such punishment for such offenses be deemed to contravene any other provision of this constitution.

In Massachusetts, the Legislature responded by subsequently reinstating the death penalty. Thus, in the majority of states the death penalty has received public acceptance.

---

[3]*See State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983); *People v. Frierson,* 25 Cal. 3d 142, 599 P.2d 587, 158 Cal. Rptr. 281 (1979) (Cal. Const. art. 1, § 27 validates death penalty as permissible punishment); *State v. Sheppard,* 331 A.2d 142 (Del. 1974); *Gilreath v. State,* 247 Ga. 814, 279 S.E.2d 650 (1981); *Brewer v. State,* 275 Ind. 338, 417 N.E.2d 889 (1981); *State v. Myles,* 389 So. 2d 12 (La. 1979); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980); *State v. Williams,* 652 S.W.2d 102 (Mo. 1983); *State v. Anderson,* 207 Neb. 51, 296 N.W.2d 440 (1980); *Shuman v. State,* 94 Nev. 265, 578 P.2d 1183 (1978); *State v. Bass,* 189 N.J. Super. 445, 460 A.2d 214 (1983); *State v. Rondeau,* 89 N.M. 408, 553 P.2d 688 (1976); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982); *State v. Austin,* 618 S.W.2d 738 (Tenn. 1981); *Ex parte Granviel,* 561 S.W.2d 503 (Tex. Crim. App. 1978); *Hopkinson v. State,* 632 P.2d 79 (Wyo. 1981).

The defendant in this case would be subject to the death penalty in most other jurisdictions.

We turn now to examine the issues of proportionality and community standards in our own state. As noted above, RCW 10.95.130 dictates a consideration of proportionality as a part of appellate review. We thus compared the penalty imposed in this case with the penalty in similar Washington cases and found no disproportionate application.

The 1975 initiative authorizing a mandatory death penalty is reflective of current community standards. The voters of Washington approved that initiative by a 67.8 percent majority. Laws of 1975, 2d Ex. Sess., ch. 9 (codified at RCW 9A.32.045–.047) (repealed 1981). Subsequent legislation has responded to constitutional mandates to avoid arbitrary, standardless imposition of the death penalty. Comment, *The Death Penalty in Washington: An Historical Perspective,* 57 Wash. L. Rev. 525 n.4 (1982). *See Godfrey v. Georgia,* 446 U.S. 420, 428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980). The statute adopted by the Legislature in 1981 authorizes the death penalty under certain aggravating circumstances. RCW 10.95.

Clearly the mandate of the people of Washington, as expressed through the legislative and initiative processes, is to impose the death penalty. We, as Justices, are bound to uphold and enforce this law absent a constitutional prohibition. We must not superimpose personal morality nor utilize strained interpretations of the law to sidestep this difficult issue.

> "Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures." *Dennis* v. *United States,* 341 U. S. 494, 525

(1951) (Frankfurter, J., concurring in affirmance of judgment).

(Footnote omitted.) *Gregg,* at 175. Accordingly we affirm the lower court judgment. We find no grounds for invalidating the death penalty as cruel punishment in violation of Const. art. 1, § 14.

Lastly, on the day of oral argument, one of the two court appointed attorneys, Mark Mestel, informed this court of Campbell's wish that he no longer represent him. At that time, the court instructed that oral argument by Mestel and co–counsel Anthony Savage continue. Subsequently, this court received a letter written by Campbell addressing his dissatisfaction with Mestel, but not Savage. A review of this letter reveals no new colorable grounds to have warranted dismissal of Mestel. Rather, we find these men provided Campbell with the effective assistance of counsel. A tape of oral argument was sent to defendant and he was given additional time to file a reply brief. No new issues worthy of discussion were raised.

Judgment and sentence affirmed.

## APPENDIX
### STATES WITH A DEATH PENALTY

| | |
|---|---|
| Alabama | Ala. Code §§ 13.A.–5–39 through –59 (1983) |
| Arizona | Ariz. Rev. Stat. Ann. §§ 13–703 through –706 (1983) |
| Arkansas | Ark. Stat. Ann. §§ 41–1301 through –1358 (1983) |
| California | Cal. Pen. Code §§ 190 through 190.7 (by initiative) (West 1984) |
| Colorado | Colo. Rev. Stat. §§ 16–11–101 through –103 (1982) |
| Connecticut | Conn. Gen. Stat. §§ 53a–45 through –46b (1983) |
| Delaware | Del. Code Ann. tit. 11 § 4209 (1982) |
| Florida | Fla. Stat. Ann. § 921.141 (West 1984) |
| Georgia | Ga. Code §§ 17–10–30 through –63 (1983) |
| Idaho | Idaho Code § 19–2515 (1983) |
| Illinois | Ill. Ann. Stat. ch. 38 § 9–1 (Smith–Hurd 1982) |
| Indiana | Ind. Code Ann. § 35–50–2–9 (Burns 1984) |
| Kentucky | Ky. Rev. Stat. Ann. §§ 532.025 through .100 (Baldwin 1983) |
| Louisiana | La. Code Crim. Proc. Ann. art. 905 through 905.9 (West 1984) |
| Maryland | Md. Ann. Code art. 27 §§ 71 through 79, §§ 412(b) through 414 (1983) |
| Massachusetts | Mass. Gen. Laws Ann. ch. 279 §§ 57 through 71 (West 1982) |
| Mississippi | Miss. Code Ann. §§ 99–19–101 through –107 (1983) |
| Missouri | Mo. Rev. Stat. §§ 565.030 through .032 (1984) |
| Montana | Mont. Code Ann. §§ 46–18–301 through –310 (1983) |
| Nebraska | Neb. Rev. Stat. §§ 29–2520 through –2546 (1983) |
| Nevada | Nev. Rev. Stat. §§ 200.030 through .035 (1984) |

| New Hampshire | N.H. Rev. Stat. Ann. §§ 630:1, :5 (1983) |
| New Jersey | N.J. Stat. Ann. § 2C:11–3 (West 1982) |
| New Mexico | N.M. Stat. Ann. § 31–14–1 (1984) |
| New York | N.Y. Correct. §§ 650 through 666 (McKinney 1983) |
| North Carolina | N.C. Gen. Stat. § 15A–2000 (1983) |
| Ohio | Ohio Rev. Code Ann. §§ 2929.02 through .06 (Page 1983) |
| Oklahoma | Okla. Stat. Ann. tit. 21 §§ 701.9 through .15 (West 1983) |
| Pennsylvania | Penn. Stat. Ann. tit. 42 § 9711 (Purdon 1983) |
| South Carolina | S.C. Code Ann. §§ 16–3–20 through –50 (Law Co–op. 1983) |
| South Dakota | S.D. Codified Laws Ann. §§ 23A–27A–1 through –41 (1984) |
| Tennessee | Tenn. Code Ann. §§ 39–2–202 through –205 (1983) |
| Texas | Tex. Crim. Proc. Code Ann. § 37.071 (Vernon 1983) |
| Utah | Utah Code Ann. §§ 76–3–206, –207 (1983) |
| Vermont | Vt. Stat. Ann. tit. 13 § 2303 (1983) |
| Virginia | Va. Code §§ 19.2–264.2 through .5 (1983) |
| Washington | RCW §§ 10.95.010 through .900 (1983) |
| Wyoming | Wyo. Stat. §§ 6–2–101 through –103 (1984) |

## STATES WITHOUT A DEATH PENALTY

| State | Statute | Repealed | By Court | By Legis. | Maximum Penalty |
|---|---|---|---|---|---|
| Alaska | Alaska Stat. § 12.55.125 (1984) | 1957 (Terr.) | | x | Term not –20 yrs, not +99 yrs |
| Hawaii | Hawaii Rev. Stat. § 706–606 (1983) | 1957 (Terr.) | | x | Life w/out parole |
| Iowa | Iowa Code Ann. §§ 902.1, 902.2 (West 1982) | 1976 | | x | Life w/out parole |
| Kansas[4] | Kan. Stat. Ann. § 21–4501(a) (1981) | 1973 | x | | Life min. 15 yrs |
| Maine | Me. Rev. Stat. Ann. tit. 17–A, §§ 201, 1251 (1983) | 1887 | | x | Life min. 25 yrs |
| Michigan | Mich. Comp. Laws § 28.548 (1983) | 1847, 1963 | | x | Life w/out parole |
| Minnesota | Minn. Stat. § 609.185 (1983) | 1911 | | x | Life min. 25 yrs |
| North Dakota | N.D. Cent. Code §§ 12.1–32–01, –09 (1983) | 1973 | | x | Life min. 30 yrs |
| Oregon[5] | Or. Rev. Stat. §§ 163.095, .105 (1983) | 1981 | x | | Life min. 30 yrs |
| Rhode Island[6] | R.I. Gen. Laws § 11–23–1 (1983) | 1979 | x | | Life min. 30 yrs |
| West Virginia | W. Va. Code § 61–2–2 (1983) | 1965 | | x | Life w/out parole |

| Wisconsin | Wis. Stat. Ann. § 939.50(3)(a) (West 1984) | 1853 | x | Life min. 20 yrs |

ROSELLINI, BRACHTENBACH, and DORE, JJ., and CUNNINGHAM, J. Pro Tem., concur.

ROSELLINI, J. (concurring)—I concur in the majority's analysis and conclusion that defendant Campbell was properly found guilty of aggravated murder. His death sentence violates neither the state nor federal constitution. I feel compelled, however, to respond specifically to the dissents of my fellow Justices, reiterating arguments made in the majority opinion. Justice Utter questions two aspects of the statutory scheme for imposing the death penalty: (1) prosecutorial discretion in seeking the death penalty in cases of aggravated murder; and (2) a lack of standards to guide the jury in imposing the death sentence and to guide the reviewing court as to proportional application. Justice Dolliver questions the majority's discussion of both state and federal prohibitions against cruel punishment, and its conclusion that the statutory scheme does not violate those prohibitions.

In responding to these issues, it may be well to outline Washington's statutory scheme, since the relationship between the various elements determines its inherent fairness and its compliance with directives set down by the United States Supreme Court and this court.

1. The statute delineates specific circumstances which constitute aggravated murder, thus narrowing the class of

[4]*State v. Randol,* 212 Kan. 461, 513 P.2d 248 (1973) (death penalty invalidated following *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972)).

[5]*State v. Quinn,* 290 Or. 383, 623 P.2d 630 (1981) (statutory authority of an enhanced penalty to be imposed by court determination denied defendant's right to trial by jury embodied in Or. Const. art. 1, § 11).

[6]*State v. Cline,* 121 R.I. 299, 397 A.2d 1309 (1979) (mandatory death penalty statute unconstitutional under Eighth Amendment by reason of its failure to provide for consideration of any mitigating factors).

persons subject to life imprisonment or death. RCW 10.95-.020. In this respect the statute conforms to the requirements of *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). That case requires that the extreme sanction of death should "not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia,* 428 U.S. 153, 188, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976).

2. The statute provides that any person found guilty of aggravated murder shall serve a life sentence without possibility of release; or, alternatively, the person shall be subject to a special sentencing proceeding to consider imposition of the death penalty. RCW 10.95.030. This bifurcated process complies with that suggested by the United States Supreme Court as "more likely to ensure elimination of the constitutional deficiencies identified in *Furman.*" *Gregg,* at 192.

3. At the prosecutor's discretion, a special sentencing proceeding may be sought "when there is reason to believe that there are not sufficient mitigating circumstances to merit leniency." RCW 10.95.040(1). Further, the statute requires that the prosecutor give written notice to defendant within 30 days of arraignment that a special sentencing proceeding will be sought because of an absence of sufficient mitigating circumstances. RCW 10.95.040(2).

In *Gregg,* the Court denied a challenge to prosecutorial discretion under the Georgia statute, denying as well challenges to discretionary opportunities in the hands of the jury or Governor. *Gregg,* at 199. Moreover, this court reached a similar conclusion in a unanimous decision in *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984).

> The prosecutor's discretion to seek or not seek the death penalty depends on an evaluation of the evidence of mitigating circumstances. This evaluation must determine if sufficient evidence exists to convince a jury beyond a reasonable doubt that there are not sufficient mitigating circumstances. . . .

. . . The prosecutor does not determine the sentence; the prosecutor merely determines whether sufficient evidence exists to take the issue of mitigation to the jury. This type of discretion does not violate equal protection.

(Citation omitted.) *Dictado,* at 297–98. *See also State v. Rupe,* 101 Wn.2d 664, 699–700, 683 P.2d 571 (1984).

4. The statute next outlines who will hear the special sentencing proceeding. RCW 10.95.050. It provides for the continuation of the same jury that heard and determined the guilt phase, unless jury trial is waived by the defendant, or unless circumstances necessitate the impaneling of a new jury.

5. The statute then provides for the conduct of the special sentencing proceeding, including opening statements and presentation of evidence. The statute contemplates that evidence from the guilt phase will be carried forward into the sentencing phase:

In addition to evidence of whether or not there are sufficient mitigating circumstances to merit leniency, if the jury sitting in the special sentencing proceeding has not heard evidence of the aggravated first degree murder of which the defendant stands convicted, both the defense and prosecution may introduce evidence concerning the facts and circumstances of the murder.

RCW 10.95.060(3), in pertinent part. Our decision in *State v. Bartholomew,* 101 Wn.2d 631, 683 P.2d 1079 (1984) limited the *new* evidence which may be presented by the prosecution at the sentencing phase.

As noted in the majority opinion, the defense may not be limited in its presentation of factors which would argue for lenience, citing *Eddings v. Oklahoma,* 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978).

What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.

*Zant v. Stephens,* 462 U.S. 862, 879, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983).

The statute, however, does provide examples of relevant

factors which may be considered by the jury, but does not limit those factors. RCW 10.95.070. In *Bartholomew,* we considered the necessity of defining "mitigating circumstances" for the jury. In that case, we concluded that the trial court's reading to the jury of the factors delineated in RCW 10.95.070 "adequately guided the jury as to the nature and function of mitigating circumstances." *Bartholomew,* at 647. *See also State v. Rupe, supra* at 701.

6. As a final check against an unjustified imposition of the death penalty, the statute requires this court to review every death sentence and determine whether there was sufficient evidence; whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant"; and whether the sentence was the result of passion or prejudice. RCW 10.95.130(2)(b). In this regard, the trial court shall have submitted to this court detailed answers as to the defendant, the evidence, and the existence of mitigating circumstances. RCW 10.95.120.

At four specific points, the statutory scheme narrows the class of persons subject to the death penalty: first, on the basis of specific elements of aggravated murder; second, with the prosecutor's decision to seek the death penalty for lack of mitigating circumstances; third, with the jury's consideration of mitigating circumstances; and fourth, with this court's ultimate review of the prior proceedings. This compares favorably with the Georgia plan upheld in *Zant v. Stephens, supra.*

> The Georgia scheme provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage.

*Zant,* 462 U.S. at 879. The Georgia plan similarly provides for Supreme Court review to determine whether the death sentence "was arbitrary, excessive or disproportionate." *Zant,* at 879–80.

This court must draw a fine line to preserve defendant's unrestricted right to argue any factors meriting leniency, while at the same time preserving standards which prevent

capricious imposition of the death penalty. Our statute, as interpreted by case law, achieves that balance.

Justice Dolliver's concurring/dissenting opinion appears to question this court's ability to consider a constitutional issue not fully briefed by the parties. His position, however, fails to note that Justice Utter specifically raises the issue of "cruel punishment," by arguing a violation of Const. art. 1, § 14. The issue of proportionality is discussed extensively in Justice Utter's concurring/dissenting opinion. Historically, proportionality has been measured under both the federal and state constitutional prohibitions against cruel punishment. The majority opinion appropriately traces this history, and concludes that the statutory scheme for imposing the death penalty violates neither state nor federal prohibition.

More importantly, this court would be remiss in its duty were it to overlook any apparent or implied constitutional challenge to imposition of a sentence of death. In criminal cases, this court liberally interprets its own rules to permit assertions of constitutional rights. RAP 2.5(a). *See Aripa v. Department of Social & Health Servs.*, 91 Wn.2d 135, 588 P.2d 185 (1978) (issues not presented to trial court will not be heard on appeal "except for cases involving denial of fundamental constitutional rights in criminal trials . . ." *Aripa,* at 141). *See also State v. Lampshire,* 74 Wn.2d 888, 447 P.2d 727 (1968). Where a man's life is in balance, we are the more obligated to consider all issues raised.

Finding no constitutional defects in defendant's trial or in the statute on which it was based, I concur with the majority in affirming Campbell's conviction and sentence.

DORE, J., and CUNNINGHAM, J. Pro Tem., concur with ROSELLINI, J.

UTTER, J. (concurring in part, dissenting in part)—I concur in that part of the opinion which affirms the conviction for aggravated murder. I dissent to that portion of the opinion that upholds the imposition of the death penalty.

Charles Campbell will die in prison, as he should. The only question before us is whether it will be of natural causes or at the hand of the State.

The Washington capital punishment scheme is applied arbitrarily, without pattern or meaningful standards, and therefore violates the equal protection clause of the fourteenth amendment to the United States Constitution. It is also void for vagueness and violates article 1, section 14 of our state constitution by conferring upon the prosecutor standardless discretion to require a special sentencing proceeding. The statute violates these constitutional provisions by allowing the prosecuting attorney to choose who the jury may decide to sentence to death if convicted of aggravated first degree murder, while removing from that consideration criminals convicted of murder similar in circumstance and character. Although language was used in *State v. Dictado,* 102 Wn.2d 277, 297–98, 687 P.2d 172 (1984), stating that the prosecutorial discretion in RCW 10.95 does not violate equal protection, it was of limited application as it only applied to the mandatory life sentence and not to the additional problems raised by the death penalty aspect of the sentencing scheme.

This court is required by statute to review three matters in all cases where the death penalty has been imposed. RCW 10.95.130 requires this court in each case to decide whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4). That question is: "'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?'" The second is whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. The third is whether the sentence of death was brought about through passion and prejudice.

To conscientiously comply with the requirements of the statute, judges on this court must first determine whether there are sufficient mitigating circumstances. Here,

unfortunately, there is no satisfactory definition of what a mitigating circumstance is. In Lobsenz, *Unbridled Prosecutorial Discretion and Standardless Death Penalty Policies: The Unconstitutionality of the Washington Capital Punishment Statutory Scheme*, 7 U. Puget Sound L. Rev. 299, 343 (1984), the author observes:

> The statute provides no definition of the term "mitigating circumstance." The closest the statute comes to a discussion of mitigating circumstances is contained in RCW 10.95.070. This section does not speak of mitigating circumstances as such, but instead permits jury consideration of "any relevant factors." The factors listed do not all militate in favor of leniency. The last relevant factor concerns the question of "whether there is a likelihood that the defendant will pose a danger to others in the future." Presumably an affirmative answer to this question militates against leniency. Although some of the factors listed in RCW 10.95.070 could be taken as mitigating circumstances, neither the prosecuting attorney nor the jury is told why these factors qualify as mitigating factors. Since the list is expressly stated to be only illustrative, the statute conveys that there are other relevant factors, yet no legislative directive tells how to determine if these other relevant factors qualify as "mitigating circumstances."
>
> If the underlying truth is that *anything* may be a mitigating circumstance, then RCW 10.95 is completely standardless, and the statute fails to "'guide' and 'regularize' the discretion of the sentencing jury and [to] make the process of sentencing to death 'rationally reviewable.'"

(Footnote omitted.)

In *Godfrey v. Georgia*, 446 U.S. 420, 428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980), the United States Supreme Court has emphasized that a state has

> a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." It must channel the sentencer's discretion by "clear and objective standards"

that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death."

(Footnotes and citations omitted.) The specific and detailed guidance mandated by *Godfrey* is lacking in this statute's sentencing phase and this court has no standards by which to determine what a mitigating circumstance is. Even if the specific and detailed guidance mandated by *Godfrey* does not apply to the sentencing phase, *see Zant v. Stephens,* 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983) (Marshall, J., dissenting), our state constitution "requires stringent procedural safeguards so that a fundamentally fair proceeding is provided. Where the trial which results in imposition of the death penalty lacks fundamental fairness, the punishment violates article 1, section 14 of the state constitution." *State v. Bartholomew,* 101 Wn.2d 631, 640, 683 P.2d 1079 (1984).[7]

Even if the court could determine what constitutes a mitigating circumstance, no guidance is provided by the statute as to whether some mitigating circumstances are more meritorious than others. If all mitigating circumstances are equally meritorious, is one enough to merit leniency or are more required? There is no definition for the word "sufficient", which leaves the prosecutor and juror free to follow their own personal feelings. For one juror or prosecutor youth may be a sufficient factor; for another, a mental illness; for another, no prior record; for another, a low mental capacity. Our statute requires just one aggravating factor to be sufficient to impose capital punishment. Is one mitigating factor likewise sufficient? The statute fails to say so and by so failing leaves this court and jurors without articulable standards which we may apply.

Second, this court must determine whether the sentence of death is excessive or disproportionate to the sentence imposed in similar cases. Since Washington's death penalty was reinstituted after *Furman v. Georgia,* 408 U.S. 238, 33

---

[7]*Bartholomew* did not address the prosecutorial discretion issue raised here.

L. Ed. 2d 346, 92 S. Ct. 2726 (1972), numerous occasions have arisen in which the prosecuting attorney had the opportunity to request a special sentencing proceeding. A review of our records from January 1981 to November 1984 reveals 140 cases other than automobile homicides, where human life was violently taken. In 61 of those cases, there appeared to be no aggravating factors. Although some of these cases arose after our *Frampton* decision invalidating the 1977 death penalty act, *State v. Frampton,* 95 Wn.2d 469, 627 P.2d 922 (1981), of approximately 46 charges filed under the 1977 act, only 12 sought the death penalty and only 2 others sought life without parole.

The pattern of filings and of jury verdicts under our new statute defies any rational explanation. Out of 33 aggravated murders charged since the last statute was passed, the death penalty was sought in only 11 cases. We can find no basis on the face of these cases to explain why many of the cases where the death penalty was not sought differ in substantial degree from many where the death penalty was sought. In State v. Carey, Whatcom County cause 82-1-00291-0 (Feb. 10, 1983), a 28-year-old Caucasian was charged and convicted of the arson murder of his wife and 18-month-old son. The death penalty was not sought. In State v. Ramil, King County cause 81-1-01924-9 (Nov. 18, 1981); State v. Guloy, King County cause 81-1-01924-9 (Nov. 18, 1981); and *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984), the defendants were involved in the execution slaying of two union reformers who were elevated to office to achieve change in corrupt union practices. The death penalty was not sought. In State v. Kincaid, Yakima County cause 82-1-00396-0 (Dec. 27, 1982) and State v. Brown, King County cause 82-1-03429-7 (Apr. 13, 1983), two innocent victims were killed by each defendant and yet the death penalty was not sought. In State v. Manthie, Kitsap County cause 82-1-00003-3 (June 21, 1982) and State v. Edmondson, Kitsap County cause 82-1-00244-3 (Mar. 16, 1983), both cases arising from the same crime, one defendant was hired by the other to commit murder

and the death penalty was not sought.

Most recently, David Frederick Simmons and Henry William Dailey, Jr., were convicted of aggravated murder for killing a Lynnwood couple and then hiding their bodies in Lake Sammamish. The death penalty was not sought. On October 23, 1984, Pierce County Superior Court Judge Thomas A. Swayze, Jr., sentenced Louis Otis Maryland to life without parole after he pleaded guilty in the death of an 85–year–old woman whose body was found in her burned–out home. In a typewritten confession, Maryland stated that he intended to rob the woman who he knew had money because of a previous business transaction with her. Maryland said that he tied up his victim and tried "to put [her] to sleep" by injecting her with insulin he found in her kitchen. After that attempt failed, he next tried "anything that was liquid in the kitchen," including alcohol and chlorine. He then said he tried unsuccessfully to strangle her and suffocate her. Finally, he doused her room and part of the living room with turpentine and set the house on fire. The prosecutor told the judge that the prosecutors agreed not to seek the death penalty if Maryland pleaded guilty. In all the remaining cases where no death penalty was sought, the defendants killed innocent victims in the course of either a rape or other felony, and yet faced no possibility of execution.

In the 11 cases out of the 35 aggravated murders where the death penalty was sought, a jury did not authorize imposition of the death penalty in 6. In one of these, one person was killed, in two, two were killed and in another one the codefendant in the Wah Mee Club killing of 13 people faces the death penalty while his two accomplices do not. State v. Ng, King County cause 83–1–00504–0 (Oct. 25, 1983). The King County prosecutor recently announced that no aggravated charges will be filed against Tony Ng, a recently discovered suspect in the Wah Mee killings.

Finally, the court is required to determine whether the sentence of death was brought about through passion and prejudice. The structure of this statute makes that deter-

mination difficult, if not impossible. Where a prosecutor has "reason to believe" that there are not sufficient mitigating circumstances as determined solely within his discretion, he is directed to request a death sentence. Even though there may be a number of identifiable mitigating circumstances, if the prosecutor believes there is one reason to believe the mitigating circumstances are not sufficient, this is all that is required to put the question of capital punishment before the jury. The statute requires no reason to be stated for the record, nor any justification for requesting capital punishment. No affidavit filed with the court is required and we are absolutely unable to determine what the underlying reason is for allowing the jury to consider imposition of the death penalty that distinguishes it from other aggravated murders.

In a case as factually repugnant as this, it may be difficult to conceive of any reason to quarrel with the prosecutor's choice. Indeed, the facts were so repugnant that the prosecuting attorney officially acknowledged the receipt of a petition containing over 1,000 signatures calling on the prosecutor to seek the death penalty. The prosecutor placed the petition in his official file and sought the death penalty. Public outcry may, however, be a double–edged sword which makes impossible the determination of whether or not passion or prejudice plays a role in bringing about the sentence of death. In King County, labor reform leaders were allegedly gunned down by hired assassins. Members of the defendants' ethnic community asked that the prosecutor not seek the death penalty against codefendants in that case. The death penalty, in turn, was not sought. The nature of the deaths, the argument that the killings were for hire, and the brutal murders of idealistic labor reformers make that case difficult to distinguish from other homicides of the most aggravated nature.

Because there is no requirement for the prosecutor to state the reason for his belief that there are not sufficient mitigating factors, the statute is open to a politicized determination of whether or not the jury should be

required to determine whether or not the death penalty should be imposed. I believe this is a fatal flaw.

The United States Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 565, 41 L. Ed. 2d 935, 956, 94 S. Ct. 2963 (1974) highlighted the fundamental requirement that procedural due process guarantees citizens the right to an explanation when governmental officials take action that adversely affects them: "[T]he provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly." Lacking such a requirement, I believe this statute leaves the court with a constitutionally defective inability to fulfill its duty of review.

In *People ex rel. Rice v. Cunningham,* 61 Ill. 2d 353, 336 N.E.2d 1 (1975), the Illinois Supreme Court examined that state's death penalty. That statute directed a panel of three judges to decide whether "there are compelling reasons for mercy" such that the death sentence should not be imposed. That court concluded, "the provision is defective because it does not contain standards or guidelines to be considered in determining whether there are 'compelling reasons for mercy' and the imposing of a sentence other than a sentence of death." *Cunningham,* at 361. I cannot distinguish the problem presented to the *Cunningham* court from that presented to this court.

If the policy of this state is retribution for capital crimes, then it must be evenhanded. Evidence nationally of discriminatory and irrational application of the death penalty is substantial. *See, e.g.,* Bowers & Pierce, *Arbitrariness and Discrimination Under Post–Furman Capital Statutes,* 26 Crime & Delinq. 563 (1980); Foley & Powell, *The Discretion of Prosecutors, Judges, and Juries in Capital Cases,* 7 Crim. Just. J. 16 (Fall 1982); Jacoby & Paternoster, *Sen-*

*tencing Disparity and Jury Packing: Further Challenges to the Death Penalty,* 73 J. Crim. L. & Criminology 379 (1982); Kleck, *Racial Discrimination in Criminal Sentencing: A Critical Evaluation of the Evidence With Additional Evidence on the Death Penalty,* 46 Am. Soc. Rev. 783 (1981); Radelet, *Racial Characteristics and the Imposition of the Death Penalty,* 46 Am. Soc. Rev. 918 (1981); Zeisel, *Race Bias in the Administration of the Death Penalty: The Florida Experience,* 95 Harv. L. Rev. 456 (1981).

The potential for discriminatory imposition of the death penalty has been recognized by lower federal courts. *See, e.g., Harris v. Pulley,* 692 F.2d 1189, 1197 (9th Cir. 1982), *rev'd and remanded,* ___ U.S. ___, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984) (holding that "the district court should, if it becomes necessary, provide an opportunity to develop the factual basis and arguments concerning the race–discrimination and gender–discrimination claims"). Following the remand from the Supreme Court, the Ninth Circuit has returned the case to the district court for consideration of those claims and others not addressed by the Supreme Court. *Harris v. Pulley,* 726 F.2d 569 (9th Cir. 1984). Imposition of the death penalty may even vary widely in similar circumstances between regions within a state. Bowers & Pierce, *Arbitrariness and Discrimination Under Post–Furman Capital Statutes,* 26 Crime & Delinq. 563, 601–07 (1980). See appendix.

A constitutional death penalty statute should not allow the imposition of the death penalty in a standardless manner. This State's penalty is fatally flawed for this reason and I must therefore dissent.

## APPENDIX

Probability of Receiving the Death Sentence in Florida and Georgia for Felony and Nonfelony Homicide, by Judicial Circuits/Counties

Grouped Regionally (from effective dates of respective post–*Furman* capital statutes through 1977).

| Regional Grouping of Judicial Circuits/ Counties | Felony–Type Murder | | | Nonfelony–Type Murder | | |
|---|---|---|---|---|---|---|
| | (1) Number of Homicides | (2) Number of Death Sentences | (3) Overall Probability of Death Sentence | (4) Number of Homicides | (5) Number of Death Sentences | (6) Overall Probability of Death Sentence |
| Florida | | | | | | |
| Panhandle | 31 | 18 | .581 | 384 | 2 | .005 |
| North | 140 | 19 | .136 | 836 | 15 | .018 |
| Central | 172 | 47 | .273 | 1354 | 7 | .005 |
| South | 270 | 34 | .126 | 1657 | 5 | .003 |
| Georgia* | | | | | | |
| North | 36 | 2 | .056 | 253 | 0 | .000 |
| Central | 162 | 37 | .228 | 849 | 8 | .009 |
| Fulton County (Atlanta) | 154 | 4 | .026 | 979 | 3 | .003 |
| Southwest | 103 | 23 | .223 | 882 | 0 | .000 |
| Southeast | 116 | 20 | .172 | 721 | 2 | .003 |

*The numbers of homicides for Georgia are estimates.

DOLLIVER, J., concurs with UTTER, J.

DOLLIVER, J. (concurring in the concurrence and dissent)—I concur with the views expressed by Justice Utter. I write, however, because of my concern over the treatment by the majority of the question as to whether the death penalty is per se unconstitutional under Const. art. 1, § 14: "Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted."

Although the majority states the issue is "raised implicitly", majority at 31, there is no contention by defendant, either in his brief or oral argument, that the death penalty is unconstitutional per se. The issue was not discussed by the State nor were briefs from amicus curiae requested. Under these circumstances, it seems to me inappropriate for a matter of this significance to be addressed by the court. *See State v. Rupe,* 101 Wn.2d 664, 711, 683 P.2d 571 (1984) (Dolliver, J., concurring in the result).

UTTER, J., concurs with DOLLIVER, J.

PEARSON, J. (concurring in part, dissenting in part)—I concur with the majority in affirming the aggravated murder conviction. I further concur with Justice Utter's dissent, except that part which states that a review of mitigating circumstances is impossible under the current statute.

The death penalty statute provides adequate guidance as to the "nature and function of mitigating circumstances". *See State v. Bartholomew*, 101 Wn.2d 631, 647, 683 P.2d 1079 (1984) (*Bartholomew* II). Therefore, it is my judgment that this court is able to review adequately whether sufficient mitigating circumstances exist to merit leniency.

However, I concur with Justice Utter's analysis that the statute allows the prosecutor to make discretionary decisions as to when and why the death penalty will be sought, yet does not provide a mechanism for adequate review of those decisions by this court. We are therefore unable to undertake a meaningful proportionality or passion review. This issue was not considered in *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170 (1982) (*Bartholomew* I), or *Bartholomew* II.

Accordingly, I too would hold that the statute is void for vagueness under the due process clause. I would remand for sentencing to life in prison without the possibility of parole pursuant to RCW 10.95.090. *See Bartholomew* I, at 214–16.

WILLIAMS, C.J., concurs with PEARSON, J.

After modification, further reconsideration denied December 28, 1984.