178 P.3d 1035 (2008)
STATE of Washington, Respondent,
v.
Ken Duane McKAGUE, Appellant.
No. 35536-9-II.
Court of Appeals of Washington, Division 2.
March 18, 2006.
Carol L. La Verne, Thurston County Prosecutor's Office, Olympia, WA, for Respondent.
Patricia Anne Pethick, Attorney at Law, Tacoma, WA, for Appellant.
VAN DEREN, A.C.J.
¶ 1 Ken McKague[1] appeals his conviction for unlawful possession of a controlled substance, arguing that the trial court erred in *1036 failing to suppress the marijuana evidence law enforcement officers found in his residence. We agree and, therefore, we reverse the trial court's order denying his motion to suppress and remand for further proceedings.

FACTS
¶ 2 The State charged Ken with one count of unlawful possession of a controlled substance, more than 40 grams of marijuana, under RCW 69.50.4013.[2] Before trial, Ken moved to suppress the evidence that officers found in the shed where he was staying because the initial search of the shed was conducted without a warrant and did not fall under the plain view doctrine, an exception to the search warrant rule.
¶ 3 At a Criminal Rule (CrR) 3.6 hearing,[3] Thurston County Sheriff's Department Detective Tim Rudloff testified that on November 3, 2005, he, three other members of the Sheriff's Department Special Enforcement Team, and four Department of Corrections (DOC) community corrections officers (CCOs), were apprehending persons with outstanding DOC warrants.[4]
¶ 4 Jay McKague, Ken's brother, had an outstanding DOC felony probation violation warrant[5] that listed his last known address as 13849 SE Solberg Road. Rudloff acknowledged that the DOC warrant showed Jay's address as 13849 SE Solberg Road, but he testified that he did not recall whether he looked at it before searching for Jay.[6] Nonetheless, the officers proceeded to 13903 SE Solberg Road in search of Jay because "[t]hat's basically what [law enforcement] call[s] the McKague family residence. We know that Jay McKague resides there, Ken McKague resides there, [and] . . . their mother resides there as well, and this is the place that we have arrested Jay McKague, at least from my recollection, two times before with Department of Corrections." Report of Proceedings (Aug. 14, 2006) at 6-7.
¶ 5 Rudloff had contacted Jay approximately five times before the day of this incident and four of those times Jay fled from, or attempted to hide from, law enforcement. One time, Jay hid under a pile of clothes in a back bedroom of the main house at 13903 SE Solberg Road and, on a different occasion, he ran out of a side door of the main house and officers chased him approximately 100 yards before apprehending him.
¶ 6 On November 3, the officers surrounded the main house, a 10 by 10 foot shed, and a travel trailer on the property, while Rudloff and CCO Matt Frank went to the front door. Patricia Schultz, Jay and Ken's mother, answered the door. "Frank explained to her *1037 why [they] were there and [that they] were looking for Jay McKague [and] she responded that he wasn't there right now. Officer Frank explained that [they] were going to search the residence like [they] had in the past to ensure that he wasn't there. [And they] did so." RP (Aug. 14, 2006) at 8. Rudloff testified that he did not recall whether Frank obtained permission to search the residence but, rather, told Schultz "that they were actually going to go inside."[7] RP (Aug. 14, 2006) at 24.
¶ 7 When the officers did not find Jay in Schultz's main house, they searched the outbuildings. Rudloff asked Schultz if the officers would find anyone in the outbuildings, but he did not obtain her permission to search them. Rudloff testified that Schultz told him "nobody should be in the travel trailer but [the officers] might run into Ken . . . in the shed in the back yard because he stays there," but she did not know if he was present at the time. RP (Aug. 14, 2006) at 8.
¶ 8 The door to the shed was closed but not locked and, therefore, Rudloff entered it. He observed clothing and furniture, including a couch. Rudloff testified that blankets were covering the space between the couch's armrest and the shed wall, and that there may have been "about a foot between the actual armrest [of the couch] and the wall and then about a foot-and-a-half between the lower part of the couch and the wall." RP (Aug. 14, 2006) at 18. Although Rudloff did not see the blankets moving, and Jay is over six feet tall and weighs approximately 250 pounds, Rudloff believed that Jay could have been hiding under the blankets. He testified that he believed Jay could have been hiding in the small space under the blankets because the side wall of the couch could have been cut out and a "person would be able to lay [sic] completely underneath that couch all the way to the wall, and [that he has], in fact, arrested people in that exact same scenario before."[8] RP (Aug. 14, 2006) at 20.
¶ 9 Therefore, Rudloff pulled back the blankets and found two partially open plastic grocery sacks filled with green vegetable matter that he recognized as marijuana. He also observed two full brown paper sacks under the plastic sacks and smelled an obvious odor of marijuana. Rudloff then lifted up the couch to ensure that Jay was not under it and, thereafter, exited the shed. He telephonically applied for a search warrant,[9] which was granted, and searched the rest of the outbuildings, finding additional marijuana and drug paraphernalia. When Ken subsequently arrived and acknowledged that he lived in the shed, the officers arrested him.
¶ 10 The trial court permitted the State to present the evidence that the officers gathered in the shed and the jury found Ken guilty of unlawful possession of a controlled substance, more than 40 grams of marijuana. The trial court sentenced him to 18 months in prison and 9 to 12 months of community custody.
¶ 11 Ken appeals.

ANALYSIS
¶ 12 Ken challenges the trial court's conclusion, and its factual findings supporting the conclusion, that the officers were justified in entering his residence and that their search falls under the plain view doctrine. This appeal raises the question of what home *1038 privacy rights a person residing with someone under DOC supervision retains under the Fourth Amendment to the United States Constitution and article 1 section 7 of the Washington State Constitution.
I. Standard of Review
¶ 13 The Fourth Amendment of the United States Constitution provides that people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." And article I, section 7 of the Washington State Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The Washington State Supreme Court "has held that the home receives heightened constitutional protection." State v. Kull, 155 Wash.2d 80, 84, 118 P.3d 307 (2005). "The heightened protection afforded state citizens against unlawful intrusion into private dwellings places an onerous burden upon the government to show a compelling need to act outside of our warrant requirement." State v. Chrisman, 100 Wash.2d 814, 822, 676 P.2d 419 (1984). And "[u]nder article I, section 7, warrantless searches are per se unreasonable." Kull, 155 Wash.2d at 85, 118 P.3d 307.
¶ 14 While warrantless searches are per se unreasonable, "[t]here are exceptions to the warrant requirement, but the State bears the burden of showing a warrantless search falls within one of these exceptions." Kull, 155 Wash.2d at 85, 118 P.3d 307. We "jealously and carefully" draw those exceptions to the warrant requirement. State v. Hendrickson, 129 Wash.2d 61, 72, 917 P.2d 563 (1996) (quoting State v. Bradley, 105 Wash.2d 898, 902, 719 P.2d 546 (1986)). "Plain view" is one exception to the requirement that warrantless searches are per se unreasonable. State v. Hatchie, 161 Wash.2d 390, 395, 166 P.3d 698 (2007). In determining whether a search is legal under the plain view doctrine, the first question we address is whether the police had "a valid justification to be in an otherwise protected area." Hatchie, 161 Wash.2d at 395, 166 P.3d 698.
II. Necessary Justification To Enter Ken's Shed
¶ 15 It is uncontested that the officers did not have a search warrant for 13903 SE Solberg Road residence. Therefore, the officers needed legal justification to search the property. See Hatchie, 161 Wash.2d at 395, 166 P.3d 698. Ken argues that they did not have legal justification for the search because they lacked a prior justification to enter the shed, which is the first issue we address under the plain view doctrine. Ken relies on our recent Hatchie decision, affirmed by our Supreme Court, to support his argument. See State v. Hatchie, 133 Wash.App. 100, 135 P.3d 519 (2006), aff'd, 161 Wash.2d 390, 406, 166 P.3d 698 (2007).
¶ 16 The State responds that the officers had a prior justification to enter the main house and shed because, under the Hatchie standard, they had probable cause to believe that Jay resided at 13903 SE Solberg Road. But alternatively, the State argues, because DOC was supervising Jay and had issued an arrest warrant for him, the officers needed only a reasonable suspicion to freely search the entire property for Jay.
¶ 17 In Hatchie, the Washington State Supreme Court considered whether a misdemeanor arrest warrant gave the police authority to enter a residence to search for the wanted individual. 161 Wash.2d at 395, 166 P.3d 698. The court held:
[A]n arrest warrant  even for a misdemeanor  constitutes "authority of law" which allows the police the limited power to enter a residence for an arrest, as long as (1) the entry is reasonable, (2) the entry is not a pretext for conducting other unauthorized searches or investigations, (3) the police have probable cause to believe the person named in the arrest warrant is an actual resident of the home, and (4) said named person is actually present at the time of the entry.
Hatchie, 161 Wash.2d at 392-93, 166 P.3d 698 (alteration in original).
¶ 18 The State argues that Hatchie does not apply here because DOC was supervising Jay and it had issued an arrest warrant for him because he had violated the terms of his *1039 probation. Washington courts have long established that parolees and probationers have diminished Fourth Amendment rights and that officers have a sufficient legal basis to conduct a search if they have a reasonable suspicion that a person has violated the terms of their community supervision. See State v. Campbell, 103 Wash.2d 1, 22, 691 P.2d 929 (1984); State v. Rainford, 86 Wash. App. 431, 438, 936 P.2d 1210 (1997); State v. Coahran, 27 Wash.App. 664, 666-67, 620 P.2d 116 (1980).
¶ 19 Hatchie concerns the requirements applicable for entry and search of a person's residence who has an outstanding arrest warrant and who is not a probationer or parolee and, thus, it is not directly on point. But we recently addressed the requirements for entry and search of a suspected probationer's residence in State v. Winterstein, 140 Wash. App. 676, 690-92, 166 P.3d 1242 (2007). In Winterstein, Terry Winterstein showed his CCO his residence and his room at 646 Englert Road, and informed his CCO that he could not enter two other bedrooms because they were not his. Later Winterstein notified DOC, but not his CCO, of his new address at 646 ½ Englert Road. But the address change was a ruse; Winterstein still lived at 646 Englert Road and the 646 ½ Englert Road residence was a storage trailer. Winterstein, 140 Wash.App. at 680-84, 166 P.3d 1242.
¶ 20 Thereafter, the CCO reasonably suspected that Winterstein violated his probation conditions and went to 646 Englert Road to search it. While searching the common areas of the home for Winterstein, the officers observed chemicals used to manufacture methamphetamine. The officers then applied for a search warrant and seized the contraband, charging Winterstein and one of his roommates with unlawful manufacture of a controlled substance. Winterstein, 140 Wash.App. at 679-81, 166 P.3d 1242.
¶ 21 Winterstein challenged the search, arguing that the CCO lacked the legal authority to search the 646 Englert Road residence because it was not his. Winterstein, 140 Wash.App. at 690, 166 P.3d 1242. We noted:
Washington recognizes a warrantless search exception, when reasonable, to search a parolee or probationer and his home or effects. A probation or parole officer may search the probationer's home without a warrant so long as the search is reasonable and is based upon a well founded suspicion that a violation of probation has occurred.
Winterstein, 140 Wash.App. at 691, 166 P.3d 1242 (citations omitted). And we reasoned that "[a] `well founded suspicion' is analogous to the cause requirement of a Terry stop." Winterstein, 140 Wash.App. at 691, 166 P.3d 1242 (internal quotation marks omitted) (quoting State v. Simms, 10 Wash.App. 75, 87, 516 P.2d 1088 (1973)).
¶ 22 Because "Washington caselaw does not appear to address the lengths to which an officer must go to ensure that the address he or she is searching is, indeed, the probationer's residence," we chose "to apply Terry's `specific and articulable facts' standard to [determine] whether officers are searching an appropriate address." Winterstein, 140 Wash.App. at 691-92, 166 P.3d 1242 (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Thus, here, the officers could search Jay's home so long as the search was reasonable and the officers had "specific and articulable facts which, taken together with rational inferences from those facts," support that the searched residence was Jay's. Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. 1868; Winterstein, 140 Wash.App. at 691-92, 166 P.3d 1242.

III. Review of the Trial Court's Challenged Findings and Conclusions
¶ 23 We apply a substantial evidence test in our review of Ken's challenge to the trial court's finding of facts following his motion to suppress. State v. Brockob, 159 Wash.2d 311, 343, 150 P.3d 59 (2006). "Substantial evidence is `evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.'" State v. Levy, 156 Wash.2d 709, 733, 132 P.3d 1076 (2006) (quoting State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999)). We review de novo the trial court's challenged conclusions of law two, and four through seven, in its ruling on the motion to suppress. State v. Acrey, 148 Wash.2d 738, 745, 64 P.3d 594 (2003).
*1040 A. Finding of Fact Two
¶ 24 Substantial evidence does not support the portion of the trial court's challenged finding of fact two, that 13903 SE Solberg Road was Jay's last known address. The DOC flyer, citing its felony probation violation warrant, clearly stated that Jay's last known address was 13849 SE Solberg Road. And although Rudloff believed 13903 SE Solberg Road was Jay's current residence, his testimony during the CrR 3.6 suppression hearing was only that he had arrested Jay there two unknown times previously and that 13903 SE Solberg Road was generally known as the McKague residence. He provided no testimony supporting his belief that it was Jay's current residence. And, according to Rudloff's testimony, Schultz simply stated that Jay "wasn't there right now," but not that he was not at home or that he did not reside there. RP (Aug. 14, 2006) at 8. Thus, the evidence was not sufficient to persuade a fair-minded, rational person that Jay's last known address was 13903 SE Solberg Road or that the officers had specific and articulable facts upon which to believe that Jay resided in Schultz's house.
B. Finding of Fact Three
¶ 25 In addition, evidence does not support the portion of the trial court's third finding of fact stating "[Schultz] informed detectives that she had not seen Jay that day, but he spends time in a shed behind the main residence." Rudloff provided no testimony supporting this finding during the CrR 3.6 suppression hearing. "The suppression ruling stands and falls on its own merits, based upon the evidence before the suppression judge, not what is later developed at trial." State v. Meckelson, 133 Wash.App. 431, 438, 135 P.3d 991 (2006), review denied, 159 Wash.2d 1013, 154 P.3d 919 (2007). According to Rudloff's testimony, Schultz told Frank that Jay "wasn't there right now." RP (Aug. 14, 2006) at 8. Also according to Rudloff's testimony, Schultz told him that no one would be in the travel trailer, but he "might run into Ken . . . in the shed in the back yard because he stays there." RP (Aug. 14, 2006) at 8. There was no evidence that Schultz stated that Jay stayed in or could be found in any of the outbuildings. Therefore, substantial evidence does not support this portion of finding of fact three.[10]
C. Conclusions of Law Four through Seven[11]
¶ 26 Ken argues that the search was illegal because the shed was not Jay's residence and, therefore, neither the CCO nor the police had prior justification to search it without a search warrant.[12] The trial court concluded:
4. The detectives were lawfully at the residence for the purpose of serving a valid DOC arrest warrant.
5. Detective Rudloff had a subjective belief that Jay McKague could have fit between the 2' gap between the side of the couch and the back of the shed. The detectives were lawfully on the premises conducting a search for Jay McKague, when they observed what they immediately recognized as marijuana in "plain view."
6. The discovery of the suspected marijuana was discovered inadvertently while searching for Jay McKague.
7. Defendant's Motion to Suppress, pursuant to CrR 3.6, is hereby denied.
CP at 71-72.
¶ 27 Under the plain view doctrine, we first address the trial court's conclusion that the *1041 officers had a valid justification to search the shed. See Hatchie, 161 Wash.2d at 395, 166 P.3d 698. And here, we must distinguish between a probationer's rights, i.e., Jay's, and a non-probationer's rights, i.e., Ken's.
¶ 28 "Although there is a body of law holding parolees [and probationers] have diminished Fourth Amendment rights, these cases are limited to searches of the `parolee [or probationer], his home, and his effects.'" Hocker v. Woody, 95 Wash.2d 822, 826, 631 P.2d 372 (1981) (emphasis added) (quoting Simms, 10 Wash.App. at 81, 516 P.2d 1088); see also Coahran, 27 Wash.App. at 666-67, 620 P.2d 116. Even an arrest warrant for a parolee or a probationer "only suffices to allow entry into the suspect's own residence, not the residence of a third person." Hocker, 95 Wash.2d at 825, 631 P.2d 372 (citing Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). Therefore, Jay had a diminished expectation of privacy due to his probation status, but Ken did not. Ken was owed the full protections of both the Fourth Amendment and our constitution, and he was fully entitled to an expectation of privacy within his home.
¶ 29 In this case, the officers did not seek Schultz's or Ken's permission to search the premises in general or Ken's shed, specifically. Even giving the State the benefit of the doubt about whether Jay, who was under DOC supervision, resided in his mother's house, Ken was owed the full protections of our constitution and the Fourth Amendment, and he was entitled to an expectation of privacy within his portion of the home, whether it was a bedroom in the main house or in the shed. Therefore, had law enforcement been able to legally gain entry into the house because Jay was a probationer living there, the search had to be limited to common areas and to those areas Jay was known to occupy. See Hocker, 95 Wash.2d at 826, 631 P.2d 372; Winterstein, 140 Wash.App. at 692 n. 5, 166 P.3d 1242. As such, the officers had no justification to search the shed, particularly after Schultz specifically told them that only Ken stayed in it.
¶ 30 Under our de novo review of the trial court's conclusions of law, we hold that searching Ken's shed, a non-common area of the residence and an otherwise protected area, was not justified, because "[t]he initial entry into the house was wrongful and the subsequently obtained search warrant was not curative of the original illegal entry." State v. Bean, 89 Wash.2d 467, 473, 572 P.2d 1102 (1978). The trial court erred in failing to suppress the subsequently uncovered marijuana evidence obtained in the unlawful search and seizure. State v. Ladson, 138 Wash.2d 343, 359, 979 P.2d 833 (1999); see also Kull, 155 Wash.2d at 89, 118 P.3d 307.[13]

IV. Conclusion
¶ 31 With a felony or misdemeanor arrest warrant for a person not under DOC supervision, law enforcement has limited authority to enter a residence to arrest that person if:
(1) the entry is reasonable, (2) the entry is not a pretext for conducting other unauthorized searches or investigations, (3) the police have probable cause to believe the person named in the arrest warrant is an actual resident of the home, and (4) said named person is actually present at the time of the entry.
Hatchie, 161 Wash.2d at 392-93, 166 P.3d 698.
¶ 32 For a person under DOC supervision, law enforcement has authority to reasonably search that person's residence if the officer has "specific and articulable facts which, taken together with rational inferences from those facts," support the conclusion that the residence is that of the person under DOC supervision. See Terry, 392 U.S. at 21, 88 S.Ct. 1868; Winterstein, 140 Wash. App. at 691-92, 166 P.3d 1242.
¶ 33 Any person not subject to either an arrest warrant or DOC supervision, residing with a person under DOC supervision, is entitled to the full expectation of privacy *1042 under our constitution and the Fourth Amendment in his home, but law enforcement officers may legally enter that residence if they meet the Winterstein "specific and articulable facts" standard for entry related to the person under DOC supervision. Any subsequent search for the person under DOC supervision is limited to the known areas that the person occupies and common areas of that residence. Furthermore, law enforcement officers may base their seizure of contraband on the plain view exception to the warrant requirement only in the areas occupied by the person under DOC supervision or in the common areas of the residence. Winterstein, 140 Wash.App. at 692 n. 5, 166 P.3d 1242.
¶ 34 The trial court erred in denying Ken's motion to suppress the seized evidence and, thus, we reverse the trial court's denial of Ken's suppression motion and remand for further proceedings.
We concur: BRIDGEWATER and PENOYAR, JJ.
NOTES
[1] Because the facts of this case involve a substantial discussion of both Ken McKague and his brother, Jay McKague, we refer to both men by their first names. We intend no disrespect.
[2] RCW 69.50.4013 provides:

(1) It is unlawful for any person to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his or her professional practice, or except as otherwise authorized by this chapter.
(2) Except as provided in RCW 69.50.4014, any person who violates this section is guilty of a class C felony.
[3] CrR 3.6 provides:

(a) Pleadings. Motions to suppress physical, oral or identification evidence, other than motion pursuant to rule 3.5, shall be in writing supported by an affidavit or document setting forth the facts the moving party anticipates will be elicited at a hearing, and a memorandum of authorities in support of the motion. Opposing counsel may be ordered to serve and file a memorandum of authorities in opposition to the motion. The court shall determine whether an evidentiary hearing is required based upon the moving papers. If the court determines that no evidentiary hearing is required, the court shall enter a written order setting forth its reasons.
(b) Hearing. If an evidentiary hearing is conducted, at its conclusion the court shall enter written findings of fact and conclusions of law.
[4] Only Rudloff testified at the hearing.
[5] DOC issues an arrest warrant when a person it is actively supervising violates the terms of his or her supervision.
[6] At oral argument, the State seemed to suggest that the only evidence of the 13849 SE Solberg Road address was on a flyer introduced by the defense at trial, not on a copy of the actual warrant. The record on appeal contains a wanted person flyer issued by DOC titled "Felony Probation Violation Warrant" listing Jay's address as 13849 SE Solberg Rd.Exh. 15. We hold that the lack of a copy of the actual arrest warrant is not fatal to Ken's argument in light of the CrR 3.6 testimony.
[7] Rudloff also testified that Frank did not need to ask permission because DOC operates "under different rules." RP (Aug. 14, 2006) at 25.
[8] Rudloff testified that had reason to believe that the side wall of this particular couch was cut out because he was "a law enforcement officer and [he had] seen it before." RP (Aug. 14, 2006) at 20. When questioned further, Rudloff replied:

A. That's exactly what I'm telling you, my experience as a law enforcement officer, how I have arrested people in the past is drilled into me that I never assume that a piece of furniture is going to be what a piece of furniture is.
Q. So every single couch is going to have a false side; is that what you're saying?
A. When I'm searching for a person that's wanted, absolutely right.
RP (Aug. 14, 2006) at 20-21.
[9] In applying for the telephonic search warrant, Rudloff told the magistrate that the space between the couch and the wall "was big enough for a person to duck into," but not that he "thought there was a potential that . . . there might be some sort of false side or false bottom to the couch that [a] person might be hiding in." RP (Aug. 14, 2006) at 30.
[10] We need not determine whether substantial evidence supports the trial court's remaining findings. These unsupported findings form the basis for the trial court's conclusions under the first prong of the plain view doctrine that the officers were justified in their search of the shed.
[11] Ken challenges conclusion of law two, which states that "[t]he above Findings of Fact are incorporated herein as conclusions of law." CP at 71. We need not discuss this conclusion of law as we have already determined the necessary facts under the first prong of the plain view doctrine are not supported by substantial evidence.
[12] The facts do not support the conclusion that the searched shed was Jay's and, therefore, our analysis could feasibly end here because the officers did not have specific and articulable facts to support their conclusion that the searched residence was Jay's. See Terry, 392 U.S. at 21, 88 S.Ct. 1868; Winterstein, 140 Wash.App. at 691-92, 166 P.3d 1242. But because the trial court did not rely on this case law, we address its further erroneous conclusions of law.
[13] Because we find the officers did not have a valid justification to be in an otherwise protected area, Ken's shed, we need not further discuss Ken's arguments and the remaining portions of the challenged findings and conclusions that address the other prongs of the plain view doctrine.