FILED
COURT OF APPEALS
DIVISION II

2013 MAY 29 AM 9: 30

STATE OF WASHINGTON

DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42691-9-II |
| Respondent, | |
| v. | |
| MICHAEL JAMES MANNING, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, A.C.J. — Michael James Manning appeals his conviction for possession of a short-barreled shotgun contrary to RCW 9.41.190. The shotgun was seized by officers working for the Department of Corrections (DOC) during a search of Manning's home that occurred when his wife violated the terms of her probation. Manning contends that the trial court erred by denying his motion to suppress evidence because the warrantless seizure of the shotgun was unlawful. Because the DOC officers who discovered the shotgun were acting under statutory authority, we affirm.

FACTS

I. BACKGROUND

In February 2010, Flo Elizabeth Frost, Manning's wife, was on probation with the DOC. As part of her supervision, Frost was required to sign a standard DOC conditions requirements and instructions form. This document provided that Frost would be subject to search and seizure

of her person, residence, automobile, or other personal property if the DOC had reasonable cause to believe that she has violated a condition or requirement of her probation.

Frost's probation arrangement also required her to inform the DOC where she was residing and to report to the DOC daily for "day reporting." Verbatim Report of Proceedings (VRP) at 9. Frost was temporarily granted reprieve from the obligation to report while she sought inpatient treatment, but she was to resume reporting upon her release.

Shortly after Frost's release from treatment, a duty officer working for the DOC received a phone call from David Frost, Frost's family member who had been watching her child while she was in treatment. David indicated that he had concerns about Frost, including the possibility that she was using drugs. Receiving this information prompted the duty officer to pull Frost's case file. Upon reviewing her case, the duty officer determined that Frost had not satisfied her obligation to report to the DOC after her release from treatment. The DOC obtained an arrest warrant for Frost as a result of this violation.

On February 8, Community Corrections Specialists (CCS) Fili Matua and Brian Ford and Detective Spencer Harris of the Vancouver Police Department executed the arrest warrant at the address Frost had listed as her residence with the DOC. As the officers approached the residence, CCS Matua observed Frost in the southeast bedroom through that room's window. The officers then went to the front door of the residence, and Frost answered it. The officers advised Frost that there was a warrant for her arrest and entered the home.

While CCS Ford spoke with Frost in the living room, CCS Matua and Detective Harris conducted a "safety sweep" and a search of the home. VRP at 27. When CCS Matua and Detective Harris entered the southeast bedroom where they had previously seen Frost, they

2

observed a large safe. On top of the safe, the officers saw ammunition and a prescription pill bottle bearing Frost's name. CCS Matua knew that Frost was allowed to reside in the home with the gun safe but that she could not have access to any firearms. CCS Matua's training and experience told him that this was generally the type of safe used to store firearms. Needing to determine whether the safe was locked, CCS Matua asked Detective Harris to check the safe door. The door was unlocked and "opened right up." VRP at 40. There were several firearms inside the safe, including a double-barreled shotgun. It was apparent to Detective Harris that this shotgun was short-barreled because it was smaller than his boot, so the officers seized the shotgun. After being read her Miranda[1] rights, Frost made a statement to the effect that the bedroom where the safe was found was her "junk room." VRP at 41.

Subsequently, Frost contacted Manning and asked him to come home to watch their child while she went with the officers. When he arrived, Manning stated that the firearms, including the short-barreled shotgun, belonged to him. The State charged Manning with unlawful possession of a short-barreled shotgun.

## II. PROCEDURE

Before trial, Manning moved to suppress all evidence seized as a result of the DOC search of his residence, arguing that the search exceeded the authority granted to the officers on the basis of Frost's arrest warrant, that the search could not be justified on the basis of a protective sweep, and that the search violated DOC policy. The trial court found that there were concerns that Frost was using drugs. Additionally, the trial court found that CCS Matua and

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Detective Harris checked the residence for safety purposes and also conducted a standard DOC search because Frost had violated her probation. The trial court also entered findings that the officers had an obligation to check the safe to determine if there were any additional violations because the room appeared to be either Frost's room or a common room and that once the officers opened the safe, the illegal nature of the shotgun was immediately apparent to Detective Harris.

Based on these findings, the trial court denied Manning's motion, concluding that the search of Manning's residence was lawful because the officers had probable cause to believe that Frost resided at the residence and they had reasonable suspicion that Frost had violated her probation by failing to report. Moreover, the trial court concluded that there was a sufficient basis to check the gun safe to determine if Frost was in further violation because the room appeared to belong to Frost or, at the very least, was a common room of the residence.

Manning was then tried on stipulated facts and convicted of possession of a short-barreled shotgun pursuant to RCW 9.41.190 after a bench trial. Manning timely appeals.

## ANALYSIS

Manning argues that the trial court erred in denying his motion to suppress. We affirm Manning's conviction.

### I. STANDARD OF REVIEW

We review conclusions of law relating to the suppression of evidence de novo. *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). When reviewing the denial of a

suppression motion, we determine whether substantial evidence supports the findings of fact and whether the findings support the conclusions of law. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Substantial evidence is "'evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.'" *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006) (quoting *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)). We give great deference to a trial court's resolution of differing accounts of the circumstances surrounding the encounter set forth in its factual findings. *Hill*, 123 Wn.2d at 646. Provided there is substantial evidence to support them, we view the trial court's findings as verities. *Hill*, 123 Wn.2d at 647. Unchallenged findings of fact are considered verities on appeal. *Hill*, 123 Wn.2d at 644.

Warrantless searches and seizures are unconstitutional unless they fall within one of the narrowly drawn exceptions to the warrant requirement. *State v. Schlieker*, 115 Wn. App. 264, 269-70, 62 P.3d 520 (2003); *see also State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999). The State bears the burden of demonstrating that a warrantless search or seizure falls within an exception to the warrant requirement by clear and convincing evidence *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).

## II. THE SEARCH OF MANNING'S RESIDENCE

Manning takes issue with the trial court's conclusion that CCS Matua and Detective Harris legally conducted a security sweep and standard DOC check of a probationer's residence. Manning argues that the authority to enter the residence and to arrest Frost was premised only on the basis of her failure to report and therefore, the officers exceeded the scope of that warrant

when they did not promptly leave after making contact with Frost at the front door. Manning argues further that the officer's search cannot be justified by the protective sweep exception. Consequently, Manning claims the authority provided to the officers by Frost's arrest warrant was used as a pretext in order to conduct a general search of the residence. Manning's arguments are unavailing.

As noted above, the Washington Constitution and the Fourth Amendment to the U.S. Constitution, prohibit warrantless searches in the absence of a recognized exception. WASH. CONST. art. I, § 7; U.S. CONST. amend. IV; *State v. Parris*, 163 Wn. App. 110, 117, 259 P.3d 331 (2011), *review denied*, 173 Wn.2d 1008 (2012). But Washington law recognizes a warrantless search exception to search a parolee or probationer including her home and personal effects when there is a well-founded or reasonable suspicion of a probation violation and there is probable cause to believe that the probationer resides at the residence to be searched. *Winterstein*, 167 Wn.2d at 628, 630; *State v. Campbell*, 103 Wn.2d 1, 22-23, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985). This exception is codified in RCW 9.94A.631(1),[2] which provides:

> (1) If an offender violates any condition or requirement of a sentence, a community corrections officer may arrest or cause the arrest of the offender without a warrant, pending a determination by the court or by the department. If there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence, a community corrections officer may require an offender to submit to a search and seizure of the offender's person, residence, automobile, or other personal property.

---

[2] The legislature amended this statute in 2012. LAWS OF 2012, 1st Spec. Sess., ch. 6 § 1. Because the amendment is not relevant, we cite to the current version of the statute.

Such a categorical exception to the warrant requirement exists because parolees and probationers have a diminished right of privacy as "they are persons whom a court has sentenced to confinement but who are simply serving their time outside the prison walls." *Parris*, 163 Wn. App. at 117. Nevertheless, this diminished expectation of privacy is constitutionally permissible only to the extent "necessitated by the legitimate demands of the operation of the parole process." *State v. Simms*, 10 Wn. App. 75, 86, 516 P.2d 1088 (1973), *review denied*, 83 Wn.2d 1007 (1974). Furthermore, nonprobationers living with probationers are owed the full protections of the Washington Constitution and the Fourth Amendment. *State v. McKague*, 143 Wn. App. 531, 544-45, 178 P.3d 1035 (2008). Where a nonprobationer shares a residence with a probationer, the search must be limited to common areas and areas the probationer is known to occupy. *McKague*, 143 Wn. App. at 545.

To support his assertion that the DOC officers exceeded the scope of their authority in searching his residence, Manning relies on *State v. Hatchie*, 161 Wn.2d 390, 166 P.3d 698 (2007). There, police went to Raymond Hatchie's home looking for another resident for whom they had an arrest warrant. *Hatchie*, 161 Wn.2d at 393. The court held, *inter alia,* that an arrest warrant constitutes authority of law which allows police the limited authority to enter a residence for an arrest subject to several conditions including that the entry is not used as a pretext for conducting other unauthorized searches or investigations. *Hatchie*, 161 Wn.2d at 392.

Manning's reliance on *Hatchie* is misplaced because the entry into the residence in *Hatchie* was predicated on the arrest warrant only. For this reason the entry was allowed only to the extent necessary to effectuate the arrest. *Hatchie* 161 Wn.2d at 402. Here, however, the rules are different because of Frost's status as a probationer. Frost signed the DOC documents

regarding the conditions and requirements of her probation. In doing so, Frost acknowledged the fact that those conditions meant that she was subject to DOC rules including a search of her person, residence, automobile, or other personal property upon suspicion of a violation. RCW 9.94A.631(1).

The fact that the DOC officers had actually obtained a warrant for Frost's arrest is ultimately irrelevant as it pertains to the scope of the officer's entry and subsequent search of the residence because the search was permitted under RCW 9.94A.631(1). The officers did not need to rely on the protective sweep doctrine to justify their search. All that was required on behalf of the officers to conduct a legal search of the residence based on these facts was a reasonable suspicion that Frost had violated the terms of her probation and probable cause to believe she resided at the residence they sought to search.

Probable cause exists when an officer has reasonable and trustworthy information that would lead a person of reasonable caution to believe that the probationer lives at the place to be searched. *Winterstein*, 167 Wn.2d at 630. Per the terms of her probation, Frost was required to indicate to the DOC where she was going to reside. The DOC officers went to that listed address upon receiving information that Frost was present. As they approached the residence, officers observed Frost inside through a bedroom window. This is enough information to lead a person of reasonable caution to believe that Frost lived at the residence officers intended to search and that she had access to the room containing the gun safe. Moreover, at the time of the search, Frost's DOC file indicated that she had failed to report as ordered and that there were concerns she was using drugs. These facts provided officers with the requisite suspicion that a violation had occurred and justified a subsequent search of her residence.

8

Further, there is no indication that the arrest warrant was used as a pretext for conducting the search or that the police used a parole officer as a "stalking horse" as Manning alleges. Br. of Manning at 9. It was CCS Matua who received the information regarding the suspected probation violation and who made the decision to contact Frost. It was also CCS Matua who requested that Detective Harris check the safe to determine if it was properly secured. There is no evidence suggesting that the corrections officers were used as stalking horses in order for the police to conduct a general search of the residence.

Because of Frost's status as a probationer, no additional justification was needed to conduct the search of her home and personal property other than reasonable suspicion of a probation violation and probable cause to believe that the residence belonged to her. Therefore, substantial evidence supports the trial court's finding of fact on this issue and the trial court did not err in concluding that the search was legal.

### III. *Seizure of the Shotgun*

Manning also assigns error to the trial court's finding that the DOC officers had an obligation to determine whether the safe was locked to see if there were other probation violations. Manning suggests that the trial court found that the warrantless seizure of the shotgun was based on the plain view exception to the warrant requirement. But the facts do not support the application of such an exception in this case. Again, Manning's claims lack merit.

As we have already stated, Frost had a diminished expectation of privacy because of her status as a probationer. *Parris*, 163 Wn. App. at 117. As a result, Frost's residence, person,

vehicles and other personal property were subject to a DOC search upon reasonable suspicion of a probation violation as long as the search was limited to common areas and areas the probationer was known to occupy. RCW 9.94A.631(1); *McKague*, 143 Wn. App. 545. The officers observed Frost in the bedroom where the safe was found. They noticed that the door to the bedroom was propped open, and CCS Matua testified that there was no indication that the bedroom did not belong to Frost. A prescription pill bottle with Frost's name on it was on top of the safe indicating Frost had dominion and control of at least some items located in the room. Additionally, Frost made a statement to the officers to the effect that the bedroom was her "junk room." VRP at 41. At the very least the bedroom appears to be a common room of the residence which officers could legally search. The search of the bedroom and safe did not require the support of the plain view doctrine to justify its legality because the officers were searching pursuant to the authority granted to them by statute. Accordingly, the cases articulating the scope of the plain view doctrine have no bearing on this case.

With regard to the obligation to check for additional violations, *Parris* is instructive. In *Parris*, officers searched the residence of a probationer whose community custody conditions included prohibitions on contact with minors, possession of sexually explicit materials, and use of drugs or alcohol. *Parris*, 163 Wn. App. at 120. Parris's mother also told the officers that Parris might have obtained a firearm and that she feared he was "out of control." *Parris*, 163 Wn. App. at 120. During the search of his residence, officers found memory cards and other digital storage devices. *Parris*, 163 Wn. App. at 120. The court ruled that under the facts

present in that case, the officer had a well-founded and reasonable suspicion that the memory cards might contain evidence of additional violations; therefore, "the requirements of community custody necessitated the search [of the memory cards] both for Parris's safety and for the safety of others." *Parris*, 163 Wn. App. at 120.

The facts and circumstances surrounding the search here are similar to those in *Parris*. As in *Parris*, DOC officers received information from David Frost indicating that he was concerned that Frost might be using drugs. The DOC conditions, requirements and instructions form that Frost signed instructs probationers that they are not allowed to use, possess, or own firearms. CCS Matua knew that Frost was allowed to reside in a home with a gun safe as long as it was secured such that she had no access to firearms. CCS Matua testified that he was aware, based on his training and expertise, that a safe of the size he observed in Frost's home was capable of storing firearms. He testified further that part of a DOC search for someone subject to Frost's probation conditions would include checking to see if a safe was locked and, once it was determined to be unlocked, checking to see if it contained firearms.

Accordingly, as in *Parris*, it was necessary for the DOC officers to ensure that the safe was locked for the safety of all parties involved and because it was possible that the safe contained evidence of additional violations. *Parris*, 163 Wn. App. at 120. There is no indication that such a search should be considered excessive in light of the legitimate demands of the operation of the community custody process. *Simms*, 10 Wn. App. at 86. Therefore, substantial evidence supports the trial court's finding on this issue, and the trial court did not err in concluding that the search of the safe and the seizure of the shotgun were authorized.

No. 42691-9-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Johanson, A.C.J._

We concur:

_Hunt, J._

_Quinn-Brintnall, J._