# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  51031-6-II |
| Respondent, | |
| v. | |
| JAMES ELLIOT THEODORE HARRIS, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — James Harris appeals his convictions for first degree unlawful possession of a firearm, unlawful possession of a controlled substance, obstruction of a law enforcement officer, and making a false or misleading statement to a public servant, with the firearm and drug offenses alleging that Harris was on community custody at the time of the commission of the offense.  He argues that the State failed to establish a sufficient chain of custody to support the admission of a firearm and ammunition.  In a statement of additional grounds (SAG), Harris also argues that he received ineffective assistance of counsel because his defense counsel failed to bring a motion to suppress based on an unlawful *Terry*[1] stop.  In a supplemental brief, Harris argues that he is entitled to relief from various legal financial obligations (LFOs) imposed in his judgment and sentence. We hold that the trial court did not abuse its discretion by admitting the firearm and ammunition at trial and that Harris did not receive ineffective assistance of counsel.  We also hold that the trial

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

court improperly imposed LFOs. Accordingly, we affirm Harris's convictions and remand to the sentencing court to reconsider the imposition of LFOs.

FACTS

Shortly after midnight on April 5, 2016, Officer Scott Campbell was on patrol when he ran a records check on a white Mercedes sedan. The records check indicated that the car had been reported stolen. Before Officer Campbell activated his patrol vehicle's emergency lights, the driver of the vehicle pulled to the curb. Officer Campbell pulled behind the vehicle and activated his emergency lights. A passenger in the car, later identified as Harris, began to exit the vehicle, but Officer Campbell ordered him to remain in the vehicle, and Harris complied.

After an additional police officer arrived, they ordered the driver of the vehicle to exit; she complied and was detained. Officer Campbell then ordered Harris to exit the vehicle and walk backwards towards him. Instead, Harris ran away from the officers. Officer Campbell gave chase, repeatedly shouting for Harris to stop. Harris ran through several residential yards, along an alley, across a street, and continued through an alley before running around a garage and into the backyard of a residence. Officer Campbell lost sight of Harris after he ran around the garage but found Harris hiding behind a small fence separating the alley from the backyard.

After placing Harris in handcuffs, Officer Campbell saw a small silver-colored revolver wrapped in electrical tape on the alley side of the fence. The revolver was about five feet from where Harris had been hiding and within his line of flight from the vehicle. Officer Eric Chell, who arrived to assist, found that the revolver was loaded with two live rounds of .32 automatic caliber ammunition. During a search incident to arrest, Officer Campbell discovered a single .32 automatic caliber round in Harris's pocket.

Harris identified himself with a false name. After Officer Campbell arrested Harris and gave Harris his *Miranda*[2] warnings, Harris denied knowing anything about the revolver found by the fence. He also denied knowing that the car was stolen. He explained that he ran from the officers "[b]ecause I got dope. I'm a crack head." Clerk's Papers (CP) at 35; Report of Proceedings (RP) (3/27/17) at 43.

The State charged Harris with first degree unlawful possession of a firearm, unlawful possession of a controlled substance, obstructing a law enforcement officer, and making a false or misleading statement to a public servant, with the firearm and drug offenses alleging that Harris was on community custody at the time of the commission of the offense. Harris waived his right to a jury trial, and the case proceeded to a bench trial.

At trial, Officer Campbell testified about the incident. Officer Campbell recalled noticing the revolver on the alley side of the fence near where Harris had been hiding. He testified that it was the first time he had come across a .32 automatic caliber revolver like that during his time as a police officer. Officer Campbell testified that he pointed out the revolver to the other officers and maintained custody of Harris. Officer Campbell explained that two other officers maintained custody of the firearm while the forensic team came to the scene to process and collect the revolver as evidence.

Officer Peter Taing also testified at trial. He recalled discovering a .32 caliber, silver, revolver style handgun on the ground:

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 94 (1966).

> I discovered it on the ground, took ahold of it, observed—tried to find the serial number on it. The handle and the barrel was wrapped in electrical tape, black electrical tape, so it wasn't present. I wasn't able to look at the serial number, and then Specialist Chell was able to make the firearm safe.

RP (3-28-17) at 63. Officer Taing testified that after Officer Chell had rendered the revolver safe, they placed it back on the ground where they discovered it and contacted forensics to come process it. Officer Taing recalled that he remained with the firearm until the forensic specialist, Lisa Rossi, arrived. Officer Taing testified that when Rossi arrived, she photographed the revolver, processed it, and took it into custody. Officer Taing also recalled that when Officer Chell rendered the revolver safe, it was loaded with two rounds of .32 caliber ammunition, inscribed with "W & W." RP (3-28-17) at 67.

The State handed Officer Taing "Exhibit 7," which Officer Taing identified as a box labeled with the incident number pertaining to the case, and designated as having been packaged by Rossi on April 5, 2016, when it was transferred to her custody. Officer Taing testified that Rossi had arrived at the scene of the incident to photograph the scene and take custody of the firearm. Officer Taing testified that the same silver revolver he had seen the morning of April 5th was in the box. When asked if the revolver was in the same condition as it was that morning, Officer Taing responded, "No, sir. The electrical tape has been removed." RP (3-28-17) at 65. Officer Taing noted that aside from the electrical tape being removed, the revolver was in the same condition.

Officer Eric Chell also testified at trial. He recalled finding a silver revolver, wrapped in black electrical tape, near the fence where Harris had been hiding. Officer Chell testified that he had Officer Taing stand by the revolver to ensure that nothing happened to it before the forensic

specialist could arrive. Officer Chell explained that in order to safely place the firearm into their evidence system, he had to ensure that it was unloaded. In rendering the revolver safe, Officer Chell removed two live rounds of .32 caliber ammunition from the action of the revolver and placed them into a small clear plastic baggy. He recalled that the baggy was retained for evidence by Rossi, and the revolver was placed into a cardboard box for evidence.

Officer Chell identified "Exhibit 6" as a plastic baggy containing the live rounds of ammunition he recovered from the revolver. He testified that they appeared to be in the same condition, noted the markings on the cartridge indicated a .32 automatic caliber, and indicated they were manufactured by "WW." RP (3-28-17) at 85. Officer Chell noted that the plastic baggy was labeled with the case number pertaining to the incident. Officer Chell also identified "Exhibit 7" as being a box, bearing the case number pertaining to the incident, and containing the revolver he rendered safe at the scene of the incident. Officer Chell testified that the revolver appeared to be in the same condition with the exception that the electrical tape had been removed from the firearm and the tape was placed in a clear plastic bag in the box.

The State moved to admit Exhibit 6—the two bullets. Harris objected as to foundation, arguing that Officer Chell did not enter the bullets into evidence or place his initials on the baggy. The State responded:

> [W]ith respect to the markings on the plastic baggy, those, I think, do go to a chain of custody argument that [Harris] could certainly make at closing argument, but I think proper foundation, which is relevance and identification, has been laid. Authentication has been laid, and this officer's testified [sic] that those are the rounds removed from that revolver and they appear to be in the same condition.

RP (3-28-17) at 100. The trial court acknowledged that there was "a chain of custody issue," but admitted the bullets. RP (3-28-17) at 100.

5

Detective Brian Vold also testified at trial. Detective Vold testified that he retrieved the revolver from the property room for testing. The State presented Detective Vold with Exhibit 7—the revolver—and Detective Vold identified it as having the appropriate case number for the incident and recognized his writings on the evidence tape. Detective Vold testified that his writings reflected the day he test fired the weapon and identified the cardboard box as the same box he retrieved when he tested the firearm. Detective Vold explained that when he got the revolver from the property room he took it to the police shooting range, examined it, looked at the serial number, fired the gun three times to confirm its operability, repackaged it, and returned it to the property room.

Detective Vold testified that the revolver in the box appeared in the same condition as it was when he test fired it. He explained, "I don't come across many firearms of this make and model, this appearance. . . . [R]evolvers aren't commonly recovered. . . . [I]t's just not a common firearm." RP (3-28-17) at 106. Detective Vold also noted that the caliber of the revolver was unusual. Detective Vold testified that the cardboard box also contained a plastic bag of black electrical tape.

The State moved to admit Exhibit 7—the revolver and the bag of electrical tape—and Harris objected on the basis of foundation. The trial court admitted the exhibit, commenting, "I think it's the same as before. I think the exhibit is admissible. You may have chain of custody issues." RP (3-28-17) at 111.

Following the bench trial, the trial court concluded:

Given that the revolver at issue in this case was found within five feet of where Defendant was found hiding on April 5, 2016, that the revolver was found in the path of Defendant's flight from Officer Campbell, that it was loaded with the same caliber of ammunition as the cartridge found in Defendant's pocket, that this caliber was inappropriate for use in the revolver, and that the tape wrapped around the revolver may have been used to compensate for the use [of] that inappropriate ammunition, the defendant knowingly had a firearm in his possession and control on April 5, 2016.

CP at 37. Accordingly, the trial court concluded that all of the elements of first degree unlawful possession of a firearm had been proven beyond a reasonable doubt and that Harris was guilty as charged.[3]

The trial court imposed a special drug offender sentencing alternative. The trial court also imposed various LFOs.[4]

## ANALYSIS

### I. CHAIN OF CUSTODY

Harris argues that the trial court abused its discretion by admitting the revolver and bullets taken from the revolver at trial because the State failed to establish a sufficient chain of custody. We disagree.

Before an item is admitted into evidence, the proponent must demonstrate that the item is what it purports to be. ER 901(a). Physical evidence connected to the commission of a crime is

---

[3] The trial court also concluded that Harris was guilty as charged of unlawful possession of a controlled substance, obstructing a law enforcement officer, and making a false or misleading statement to a public servant.

[4] The trial court also entered a suspended sentence on the charges of obstructing a law enforcement officer and making a false or misleading statement to a public servant. The suspended sentence was conditioned, in relevant part, on Harris's payment of LFOs including $200 in court costs.

only admissible if it is "satisfactorily identified and shown to be in substantially the same condition as when the crime was committed." *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984).

"Evidence that is unique and readily identifiable may be identified by a witness who can state that the item is what it purports to be." *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002). "[M]inor discrepancies or uncertainty on the part of the witness will affect only the weight of evidence, not its admissibility." *Campbell*, 103 Wn.2d at 21.

The trial court has a "wide latitude of discretion" in determining the admissibility of evidence subject to a chain of custody challenge. *Campbell*, 103 Wn.2d at 21. We review the trial court's decision for an abuse of discretion. *See Campbell*, 103 Wn.2d at 21. A trial court abuses its discretion if it admits evidence contrary to law, or when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Quaale*, 182 Wn.2d 191, 196-97, 340 P.3d 213 (2014).

Here, Harris argues that the State failed to provide sufficient chain of custody evidence to support the admission of the revolver and the ammunition because the person who took the items into evidence did not testify, and because the revolver was no longer in the same condition because the electrical tape had been removed. However, because the revolver and ammunition were unique and readily identifiable, the testimony at trial was sufficient to establish that they were in substantially the same condition as the day of the incident.

Officer Taing and Officer Chell both testified as to the unique nature of the .32 automatic caliber bullets retrieved from the revolver on the day of the incident. The officers identified the manufacturer markings on the ammunition and recalled that the ammunition was not the kind made for the revolver. Both Officer Taing and Officer Chell testified that the ammunition appeared in the same condition at trial as it did the day of the incident.

Similarly, Officer Chell and Detective Vold both testified to the unique nature of the revolver. Both of them testified that discovering a revolver of that make, model, and condition was highly unusual. While Officer Chell and Officer Taing noted that the electrical tape the revolver originally had on it was unusual, the unique nature of the revolver was based on the rarity of the gun itself, not the tape. Both Officer Taing and Officer Chell recognized the revolver as the one they had recovered at the scene of the incident even though the electrical tape had been removed and placed in a plastic bag. Detective Vold also identified the revolver as the one he had received from the evidence property room and test fired.

Although Rossi did not testify at trial, the unique nature of the ammunition and revolver sufficiently established that the ammunition and revolver presented at trial were the items collected at the scene. While the electrical tape had been removed from the revolver, Officer Taing, Officer Chell, and Detective Vold all recognized the revolver and testified that it was in substantially the same condition as it had been when they first encountered it. Accordingly, we hold that the trial court did not abuse its discretion by admitting the revolver and ammunition.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

In his SAG, Harris argues that he received ineffective assistance of counsel because his defense counsel failed to bring a motion to suppress evidence based on an unlawful *Terry* stop. We disagree.

We review ineffective assistance of counsel claims de novo. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32–33, 246 P.3d 1260 (2011). Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. Prejudice exists if there is a reasonable probability that, except for counsel's errors, the result of the proceeding would have been different. *Grier*, 171 Wn.2d at 34.

When arguing ineffective assistance for failure to seek suppression of evidence, the defendant must show from the record that a motion to suppress likely would have been granted. *State v. Walters*, 162 Wn. App. 74, 81, 255 P.3d 835 (2011). "Counsel may legitimately decline to move for suppression on a particular ground if the motion is unfounded." *State v. Nichols*, 161 Wn.2d 1, 14, 162 P.3d 1122 (2007).

Under the Fourth Amendment of the United States Constitution and article I, section 7 of the Washington Constitution, a law enforcement officer generally cannot seize a person without a warrant. *State v. Fuentes*, 183 Wn.2d 149, 157–58, 352 P.3d 152 (2015). One established exception is a *Terry* stop, a brief investigatory detention of a person. *Fuentes*, 183 Wn.2d at 158. Under this exception, an officer may briefly detain a person for questioning without a warrant if

the officer has a reasonable suspicion based on specific and articulable facts that the person has been or is about to be engaged in criminal activity. *Fuentes*, 183 Wn.2d at 158.

Courts evaluate the merits of a *Terry* stop based on the totality of the circumstances, and the State must show by clear and convincing evidence that the stop was justified. *State v. Doughty*, 170 Wn.2d 57, 62, 239 P.3d 573 (2010). When a suspect's activity is consistent with both criminal and noncriminal activity, officers may still make a brief detention under *Terry* without first ruling out all possibilities of innocent behavior. *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986).

Here, given Officer Campbell's knowledge that the car Harris was in had been reported stolen, asking Harris to remain in the car while he waited for assistance was justified. This initial seizure was valid under the *Terry* doctrine, and a motion to suppress the fruits of the subsequent arrest would have failed. Consequently, defense counsel's failure to move for suppression did not amount to ineffective assistance of counsel.

### III. LEGAL FINANCIAL OBLIGATIONS

In 2018, the legislature amended the statutory landscape of LFOs. Laws of 2018, ch. 269. The recent legislation applies prospectively to defendants, like Harris, whose cases were pending appellate review and were not yet final when the legislation was enacted. *State v. Ramirez*, 191 Wn.2d 732, 747-49, 426 P.3d 714 (2018). The parties agree that this case must be remanded to the sentencing court to reconsider the imposition of LFOs consistent with the 2018 legislative amendments to the LFO provisions and *Ramirez*.

No. 51031-6-II

Accordingly, we affirm Harris's convictions but remand to the sentencing court to reconsider the imposition of LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MELNICK, P.J.

GLASGOW, J.